UNITED STATES v. DULUTH, WINNEPEG & PACIFIC RAILWAY CO. (No. 1687).[1]

1. INTERNATIONAL RAILWAY CAR.
    An international railway may bring its cars into the United States free of duty in the due course of international and incidental local traffic only, but not to engage for any period in domestic traffic only.
2. RAILWAY CAR TEMPORARILY ENGAGED IN DOMESTIC TRAFFIC.
    A railway car brought into the United States and used in domestic traffic only is not saved from a dutiable status by its owner's intention to return it ultimately to international traffic.
3. CHARACTER OF CAR NOT DETERMINED BY CHARACTER OF FREIGHT.
    A railway car which travels only within the United States does not acquire an international character by carrying international mail.
4. EVIDENCE—SUFFICIENCY OF.
    A claim in a protest that an article is in chief value of wood, against the collector's finding that it is in chief value of metal, is sustained in this case by the uncontradicted testimony of a competent witness, taken with the appraiser's advisory classification as in chief value of wood, and the fact that the Board of General Appraisers made no finding upon that issue.

United States Court of Customs Appeals, May 31, 1916.

APPEAL from Board of United States General Appraisers, G. A. 7862 (T. D. 36190).
[Reversed.]

*Bert Hanson*, Assistant Attorney General (*John J. Mulvaney* and *Henry M. Farrell*, special attorneys, of counsel), for the United States.
*A. McC. Washburn* (*J. L. Washburn*, *W. D. Bailey*, *Oscar Mitchell*, and *A. C. Gillette* of counsel) for appellee.

[Oral argument May 18, 1916, by Mr. Hanson and Mr. Washburn.]

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

MARTIN, Judge, delivered the opinion of the court:

This case calls into question the action of the collector at the port of Duluth in assessing duty upon a certain railway car, which he

claimed had been imported from Canada into this country by the appellee.

The collector classified the car as a manufacture composed in chief value of metal within the provisions of paragraph 167 of the tariff act of 1913, and accordingly assessed duty thereon at the rate of 20 per cent ad valorem.

The appellee protested against the assessment, claiming that the car in question had not been imported into this country in a tariff sense, and had never become liable to any duty as an importation. As a subordinate and secondary claim the appellee further protested that in any event the car would not be dutiable as a manufacture composed in chief value of metal under paragraph 167, *supra*, since its component material of chief value was not metal, but wood.

The protest was submitted upon testimony to the Board of General Appraisers, and was sustained upon the first claim (Judge Waite dissenting), the board holding upon the evidence that the car in question had never become an importation in the tariff sense, nor liable to any assessment of duty. In this view of the case the board did not find it necessary to pass upon the secondary claim presented by the protest.

The Government now appeals.

The facts in the case appear almost without dispute in the record The appellee is the Duluth, Winnipeg & Pacific Railway Co. and is a subsidiary of the Canadian Northern Railway system. It connects Winnipeg on the main line with Duluth, Minn., via Fort Francis, Ontario. The railroad between Fort Francis and Duluth, about 171 miles in length, lies almost entirely within the State of Minnesota, the distance between Fort Francis and the international boundary line being only a few miles.

The car now in question is a combination baggage and mail car, which was constructed in Canada in the year 1911. It was first put in service upon the Canadian main line alone, this continuing for about one year. Thereupon it was placed in service between Winnipeg and Duluth, and it continued upon that route for about two years. When in this service the car would be loaded at one terminal, say Duluth, and would be run in train to Fort Francis. where it would be dropped. It would there be "picked up" by a Canadian Northern train and taken to the other terminal, Winnipeg. This operation would be reversed upon the return schedule. During the several years that the car was thus operated it was, of course, not assessed with duty by the collector, nor was it then claimed that the car had assumed the character of an importation when it entered the United States upon its regular international runs.

However, in the month of November, 1914, the railway company, owing to traffic conditions, changed the schedule for the present car,

and operated it only between the city of Duluth and the station of Cusson, which is a station upon the company's railroad situate in Minnesota, about 123 miles north of Duluth and about 45 miles south of the international boundary. From the month of November, 1914, therefore, the present car was engaged in ordinary intrastate train service as a combination baggage and mail car upon appellee's railroad between Duluth and Cusson, carrying both local and through mail and baggage, in schedule connection with the other trains of the company, some of which continued to cover the entire distance between Duluth and Winnipeg. This course of operation continued until July 13, 1915, a period of about eight months, when the collector of the port of Duluth took cognizance of the matter and held that the car had been imported into this country by force of the foregoing facts, and accordingly assessed duty upon it. The car continued in the intrastate service last above indicated until the following November, when it was restored to the through service between Duluth and Winnipeg, after an absence from Canada of about one year. It may fairly be concluded from the evidence that when the railway company changed its schedule in November, 1914, and restricted the operation of the present car to an intrastate route, it did not intend to appropriate the car permanently to intrastate service, but expected to return it ultimately to its former international route. This intention of the company, however, was plainly indefinite as to time and details, all of which were contingent upon future business conditions. That is to say, it may fairly be inferred from the evidence that the railroad company intended to restore the car to an international run whenever traffic conditions required it, and it expected that sooner or later such conditions would arise.

It should also be mentioned that on July 13, 1915, the railway company made a formal customs entry of the car with the collector, whereupon the assessment of duty now in question was made by the collector. The duty was paid as assessed, and thereupon on August 3, 1915, the company's protest was filed in the terms above set out.

The present question therefore is whether upon the foregoing facts the board's decision sustaining the protest and holding the car in question to be nondutiable, should or should not be affirmed.

It is conceded by the appellee that railroad cars may be brought into the United States "under such circumstances as to constitute importation." This proposition is certainly correct, for the tariff act of 1913 provides that duty shall be paid "upon all articles when imported from any foreign country into the United States." Railway cars when imported into this country have been subject to duty under various tariff revisions, and locomotives are made dutiable eo nomine under paragraph 165 of the tariff act of 1913. But the appellee contends that the present car, when it was brought into this

country, was engaged in international traffic, and therefore entered as a means or vehicle of importation and not as an import itself. Accordingly the appellee denies that the car ever was "imported" in the customs sense, or that it ever became liable to the payment of any tariff duties in this country. This raises the real question in the case, namely, whether under the rules relating to international traffic the present car was entitled to come into this country and remain here in the manner and to the extent above described without acquiring the character of an importation and becoming liable as such to the assessment of tariff duties.

It is well known that certain rights have long been enjoyed in practice by international railway companies in bringing their trains into this country from Canada and Mexico, when engaged in international traffic, without the payment of customs duties upon their locomotives or cars while engaged in that service. These rights seem to have arisen from the very necessities of the case and to be due to international comity, and yet so far as we can find they have never been expressly provided for nor their terms and conditions defined by any treaty, statute, or convention of any kind. The statutes, however, have long provided that cars containing importations, in order to avoid inspection at the first port of arrival, may be sealed and closed by duly authorized officers previous to their importation into the United States, and that thereupon "the same may proceed to their port of destination without further inspection." It is provided that every such car shall proceed "without unnecessary delay" to the port of its destination as named in the manifest of its freight and be there inspected. Penalties are provided in case the car is opened before reaching its port of destination. (Revised Statutes, sec. 3102.) These provisions in a measure imply that the car within which such importations are thus sealed may cross the international boundary and proceed directly to its port of destination without becoming itself an importation or paying any customs duties as such. These provisions therefore sanction to that extent the right of cars loaded with importations to proceed across the international boundary to their port of destination without assessment of duty upon the car itself, without, however, defining the extent of that right in general or prescribing the limitations under which it must be exercised. For many years, however, this has been the subject of regulation by the Treasury Department, and a review of some of these regulations is in point in this case.

In the year 1869 the department issued a ruling that "railroad cars built in Canada and brought into the United States to be used only in the through business between Canada and the United States, and not intended for local but international use, are (when brought into the country in and for such employment) not "imported" and are, therefore, not chargeable with duty." (T. D. 347.)

In the year 1870 the department issued a ruling in enlargement of the foregoing regulation which "expressly stated that such cars should not be for local traffic in Canada, but for international use." The department continues:

An extension of the above privilege was requested by certain parties to enable such cars to take on local freight in Canada, and thereby save the expense of running empty cars from the East to the West. The application was granted, and collectors will therefore allow cars used on such through route, whether empty or laden with local or other freights, to pass without payment of duty. * * * (T. D. 648.)

In the year 1882 the Secretary of the Treasury ruled as follows:

Under date of April 27, 1870, by letter to the collector of customs at Port Huron, and of December 3, 1878, in letter to your office, this department adopted the principle that cars running between Canada and the United States for international traffic, which might even be used to some extent for local traffic, were not to be regarded as importations liable to duty. This position was taken without reference to the question whether the cars were built in Canada or in the United States.

Upon the principle adopted, that the cars, when completely furnished in the first instance, are not liable to duty, I see no reason why the expense of refurnishing such cars, under the circumstances stated, should make the materials used in such refurnishing liable to customs duties, and this department will interpose no objection to the passage of such cars free of duty when used in traffic of the character mentioned.

You are authorized to furnish the agent of the Pullman Car Co. with a copy hereof.

Very respectfully,

CHAS. J. FOLGER, *Secretary.*

COLLECTOR OF CUSTOMS, *Burlington, Vt.*
(T. D. 5093.)

In the year 1889 the Secretary of the Treasury issued instructions which are so important in the present controversy that they are here quoted in full.

(T. D. 9549.)

TREASURY DEPARTMENT, *August 3, 1889.*

SIR: The department has fully considered the question submitted by you of the dutiable or nondutiable character of foreign-built railway cars coming into the United States from Canada laden, or for the purpose of being laden, with mails, passengers, baggage, express matter, or freight.

The records of this department show that railway cars engaged in the so-called transit trade partly over the territory of the United States and partly over the territory of Canada have never been regarded as importations subject to duty, but simply as vehicles of transportation for the conducting of an established and legalized traffic. In letters from this department to the president of the New York Central Railroad Co., February 2, 1869, to the collector at Port Huron, April 27, 1870, and to the collector at Burlington, December 3, 1878, and January 9, 1882, it was held that such practice was not obnoxious to the revenue laws of the United States and did not subject foreign-built cars running in the transit trade between Canada and the United States to duty, since section 3102, Revised Statutes, authorizes foreign railway cars laden with importations to enter the United States and proceed to destination, and section 3006, Revised Statutes, authorizes the cars of both countries to engage in international traffic and the merchandise so carried to be treated as "if the transportation had taken place entirely within the limits of the United States." The principle so adopted and announced has remained in force for more than 20 years, and does not

seem to have been impeached or questioned in or by any statute or other congressional action, or any judicial decision or treaty, or any departmental regulation or instruction in all that time, it being considered that the action taken by the department January 3, 1889, and which action was recalled and rescinded before the same had taken effect, did not amount to a disturbance or impeachment of the otherwise unbroken practice.

In view of the long-settled rule and practice upon the subject, the department does not deem it conformable to the public interest to disturb the decision deliberately reached and repeatedly affirmed, and must hold that the question is no longer open to administrative construction. *It only remains to advise you that while these rulings are adhered to in deference to the reasonable requirements of commerce, not to permit such practice to degenerate into a license for the free importation of foreign-built railway cars into the domestic traffic of the United States under cover of the established usage described in the preceding paragraphs.* (Italics ours.)

Respectfully, yours,

WILLIAM WINDOM, *Secretary.*

COLLECTOR OF CUSTOMS, *Detroit, Mich.*

In the year 1892 the department issued further regulations in line with the foregoing, as follows:

(T. D. 12859).

*To officers of the customs and others:*

The department has uniformly conceded to railroad companies engaged in the transit trade between the United States and adjacent countries the right to run their cars partly over such adjacent territory and partly over United States territory without the payment of duty on entrance into this country, such cars being regarded "as simply vehicles of transportation for the conducting of an established and legalized traffic." As pointed out in department's decision of August 3, 1889 (synopsis 9549), a liberal construction of law in this respect is authorized by sections 3005, 3006, and 3102, Revised Statutes.

No question has been heretofore raised as to the inclusion in this immunity from duty of foreign locomotives, which enter the United States with trains of cars for the purposes mentioned. It appears, however, from information recently received, that a loose practice has grown up in some localities in regard to such locomotives, and that after reaching this country in their legitimate occupation with trains, they are withdrawn from that use and employed on branch railroads and in switching trains at interior stations. It seems necessary, therefore, to set forth distinctly the privileges which are accorded to locomotives on frontier routes.

Every foreign locomotive on a continuous route crossing the boundary into the United States shall be allowed to bring its train directly to and from the first customs port on its route, or to and from the termination, in the United States, of what is technically known as the "run" of the locomotive, if it be beyond the limits of such port, but no foreign-made locomotive shall be employed for the continuance of the inward trip unless such locomotive shall have been duly entered for duty in the United States.

No foreign-made locomotive (unless regularly entered at the customhouse) shall be used on the railroads of this country, except as aforesaid, for any purpose whatever.

Officers of customs are directed to observe this traffic and to seize any locomotive found to be used in violation of the above rule.

O. L. SPAULDING, *Acting Secretary.*

This subject was again referred to by the department in T. D. 16258, and the subject of locomotives crossing the international boundaries was provided for by article 660, Customs Regulations of

1908, but no departure from the foregoing principles was made in either publication.

The following is a copy of article 660, just referred to:

ART. 660. *Entry—Seizure.*—Every foreign locomotive on a continuous route crossing the boundary into the United States shall be allowed to bring its train directly to and from the first customs port on its route, or to and from the termination in the United States of what is technically known as the "run" of the locomotive, if it be beyond the limits of such port, but no foreign-made locomotive shall be employed for the continuance of the inward trip unless such locomotive shall have been duly entered for duty in the United States.

No foreign-made locomotive (unless regularly entered at the customhouse) shall be used on the railroads of this country, except as aforesaid, for any purpose whatever.

Officers of customs are directed to observe this traffic and to seize any locomotive found to be used in violation of the above rule.

Although the foregoing regulation relates in terms to locomotives only, it expresses the principles governing the department's regulations in relation to railway cars also.

In the year 1896 the department issued the following ruling:

(T. D. 17038.)

TREASURY DEPARTMENT, *April 27, 1896.*

SIR: The department duly received your letter of the 13th of January last, and has received a report upon the matter from Special Agent George W. Whitehead.

In your letter you called the attention of the department to the fact that rolling stock of the New Mexican & Arizona Railway Co. and of the Sonora Railway, which passes to and fro between Mexico and the United States, is frequently repaired at Guaymas, Mexico, and that no duty has been paid upon such repairs.

In reply, you are informed that the department has decided that such passage of railway trains on regular routes on the borders of contiguous foreign territory is not an importation, and that incidental repairs to the same do not affect such condition. (See Synopses 9549, 12859, 16258, and 16271.)

You will be governed accordingly.

Respectfully, yours,                                          W. E. CURTIS,
          (962h.)                                             *Assistant Secretary.*

COLLECTOR OF CUSTOMS, *Nogales, Ariz.*

The foregoing rulings and regulations issued by the Treasury Department have long stood as the interpretations of the law upon the present subject, as understood and enforced by the department, and it may well be said that they have been sanctioned by long-continued legislative acquiescence. They prescribe the limitations under which the right now claimed by appellee may lawfully be enjoyed, and we are convinced that the appellee's claim can not prevail unless the present transaction is within the purview of these regulations. They plainly extend to international railway companies the right to bring their locomotives and cars free of duty across the international boundary and into this country in the due course of international traffic only, and do not permit, but indeed expressly forbid, that either locomotives or cars should come into the country

in such case free of duty in order to engage for any period in local or domestic traffic only. It is plain, also, that the reason for the exemption from tariff duties in the case of locomotives and cars while actually engaged in international traffic does not apply at all to those which come across the boundary in order to engage in local or domestic traffic only in this country. In the latter case they take their place in the domestic commerce of this country, their domestic use making them articles of commerce here as distinctly as if they were brought here for sale, and when they are in use in this country they displace to that extent domestic vehicles which have either been manufactured in this country or have been imported nto the country upon the payment of tariff duties. If a railway company located entirely within this country were to bring a Canadian railway car into this country for local or domestic use it would certainly be required to pay customs duties upon it. There appears to be no reason why the same rule should not obtain in the case of an international railway, since the favoring exemption in the case of international traffic was simply designed to facilitate such traffic and not for the purpose of enlarging the rights of international railways in any other particular. The exemption from customs duties thus permitted should therefore be extended only in so far as it subserves the purpose of that and incidental local traffic, and this rule is clearly set out in the several departmental regulations above copied. The present case therefore depends for decision upon facts and principles which differ essentially from those set out in the *Conqueror* case (166 U. S., 110), which is specially relied upon by the appellee.

It is contended on behalf of the appellee company that in fact it never intended to "import" the car in question into this country, and never appropriated it permanently to domestic service here, but always intended to return the car to its former international service so soon as traffic conditions required it, and it is insisted that this intention should be the controlling fact in the case. It is also contended that the car was actually engaged in international traffic when in service between Duluth and Cusson, since it even then handled international mail under a contract with the United States, which mail was transferred, however, at Cusson to other trains and carried by them to Canadian stations.

We can not agree with either of these arguments. If a foreign article which is not intrinsically nondutiable, nor within the free list of the tariff law, be brought into this country for an indefinite period of domestic use here, which period might even continue until the article itself were worn out by use, it can not be saved from the character of an importation by reason of the fact that the owner

actually intended to take it out of the country again at an indefinite time in the future. Kidd v. Flagler (54 Fed., 367). And in the case of the present car we construe its service between Duluth and Cusson to be local and domestic notwithstanding the fact that it carried mail between those stations which was ultimately destined for Canada, or had originally come from that country. If the transportation of such mail between intrastate stations constitutes international traffic, then every mail car in the United States would be engaged in international traffic. This would certainly be too broad an interpretation to place upon that title.

We are therefore of the opinion that the facts above stated brought the car in question within the character of an importation and made it dutiable as such under the tariff laws of this country.

The collector, as above stated, assessed the car, in the absence of a specific enumeration of railway cars in the act, as a manufacture composed in chief value of metal, and accordingly assessed duty upon it at the rate of 20 per cent ad valorem under paragraph 167 of the act. The appellee company contended in its protest that the car, in fact, was composed in chief value of wood, and therefore that in no event should it be assessed with duty at more than 15 per cent ad valorem under paragraph 176 of the act.

Upon this issue we have, upon the one side, the presumption of correctness which attends the assessment of the car as composed in chief value of metal, and, upon the other hand, we have the statement of the witness Andrew McCowan to the effect that wood was the component material of chief value in the car. The presumption in favor of the collector's finding is weakened to some extent by the advisory classification of the car by the appraiser as composed in chief value of wood. And, besides this, the testimony of the witness, while somewhat indefinite, is uncontradicted except by the assessment itself. It may again be noted that the board made no finding upon this subject. Upon this state of the record we hold that the car should have been assessed with duty at but 15 per cent ad valorem as a manufacture composed in chief value of wood under paragraph 176 of the act.

The views above expressed make it unnecessary for us to discuss the question whether the customs entry of the car in question by the appellee precludes or in any manner affects the appellee's contention that the car never became an importation.

The decision of the board sustaining the protest of the appellee is therefore reversed, but reliquidation is ordered at 15 per cent ad valorem under paragraph 176 in accordance with the views above set out.

*Reversed.*