F. W. MYERS & Co., INC. *v.* UNITED STATES (No. 4504) [1]

United States Court of Customs and Patent Appeals, November 5,1945

*H. V. Spike* and *John J. Gafill* for appellant.

*Paul P. Rao,* Assistant Attorney General (*Sybil Phillips* and *Joseph F. Donohue,* special attorneys, of counsel), for the United States.

[Oral argument October 3, 1945, by Mr. Gafill and Mr. Donohue]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, JACKSON, and O'CONNELL, Associate Judges

HATFIELD, Judge, delivered the opinion of the court:

This is an appeal from a judgment of the United States Customs Court (Third Division) overruling appellant's protests and holding that so-called "heavy repairs," made in Sarnia, Canada, to nine locomotives, manufactured in the United States and exported to Canada and used exclusively in international traffic, were dutiable as assessed by the collector at the port of Detroit, Mich., at 25 per centum ad valorem under paragraph 353 of the Tariff Act of 1930, as modified by the trade agreement with the United Kingdom (T. D. 49753, 74 Treas. Dec. 253,) by virtue of the provisions of paragraph 1615 of the Tariff Act of 1930, as amended by the Customs Administrative Act, 1938. C. D. 905.

Paragraph 353, *supra,* so far as pertinent, reads:

PAR. 353. * * * articles having as an essential feature an electrical element or device, such as electric motors, *locomotives,* portable tools, furnaces, heaters, ovens, refrigerators, and signs * * *; all the foregoing, not specially provided for, finished or unfinished, wholly or in chief value of metal, and not provided for heretofore in any item numbered 353 in this schedule * * * 25% ad val. [Italics ours.]

The pertinent parts of paragraph 1615, as amended, *supra,* read:

PAR. 1615.

 *    *    *    *    *    *    *

(g) Any article exported from the United States for repairs or alterations may be returned upon the payment of a duty upon the value of the repairs or alterations at the rate or rates which would apply to the article itself in its repaired or altered condition if not within the purview of this subparagraph.

(h) The allowance of total or partial exemption from duty under any provision of this paragraph shall be subject to such regulations as to proof of identity and compliance with the conditions of this paragraph as the Secretary of the Treasury may prescribe.

Article 231 of the Customs Regulations, 1937, reads:

Art. 231. Locomotives—Railroad equipment—When entry required.—(a) Foreign locomotives or other foreign railroad equipment in use on a continuous route, crossing the boundary into the United States, may be admitted without entry or the payment of duty to proceed to and return from the end of the run, i. e., in the case of locomotives, the last place to which the locomotive takes the inbound train by a continuous haul, and in the case of other equipment, the place of complete unloading. Unless formally entered and cleared through customs in the United States, such locomotives or other equipment shall not be used on the inward trip otherwise than in connection with the continuous run. On the return trip the locomotives may be used only in connection with through trains crossing the boundary, but the other equipment may be used in such trains or for such local traffic as is reasonably incidental to its economical and prompt return to the country from whence it entered the United States. Empty foreign railroad cars may enter the United States without formal entry to be loaded only if the passengers or goods are to be transported directly to or through the country from which the cars entered the United States. Customs officers will seize any locomotive or other railroad equipment used in violation of this regulation as being imported contrary to law.

(b) Domestic locomotives or other domestic railroad epuipment upon which repairs have been made in a foreign country shall be subject upon reentry into the United States to a duty upon the value of the repairs at the rate at which the locomotive or other equipment would be dutiable if imported, but no such duty shall be assessed by reason of repairs required to restore any such article to the condition in which it last left the United States, or by reason of "running" repairs required for the immediate safety of transportation.

(c) For the purpose of this article, locomotives or other railroad equipment manufactured in, or regularly imported into, the United States, and not subsequently cleared through foreign customs into another country, nor used in foreign local traffic otherwise than as an incident of the return of the equipment to the United States, shall be considered "domestic." Other railroad equipment shall be considered "foreign."

It appears from the record that appellant (F. W. Myers & Co. Inc.) acted as customhouse broker or agent for the real party in interest, the St. Clair Tunnel Co.; that the latter company is a consolidated company, created in 1886 by an agreement of amalgamation or consolidation entered into between the Port Huron Railroad Tunnel Co., a Michigan corporation, and the St. Clair Frontier Tunnel Co., a Canadian corporation; that all of the stock of the St. Clair Tunnel Co. is owned by the Canadian National Realties, Ltd.; and that the Canadian National Realties, Ltd., is owned by the Canadian National Railway Co., which is owned by the Canadian Government.

On January 4, 1906, the St. Clair Tunnel Co. entered into a contract with the Westinghouse Electric Manufacturing Co. of Pittsburgh, Pa., whereby, in addition to other matters not of importance here, the

Westinghouse Electric Manufacturing Co. agreed "to execute, construct, finish and deliver   *   *   *   a complete installation suitable for the operation of electric locomotives upon the terminals and within the tunnel of the Tunnel Co., as fully set forth in the specifications set out in 'Exhibit A'," and to construct and sell to the St. Clair Tunnel Co. six electric locomotives, to deliver such locomotives to the Tunnel Co. at its yards in Sarnia, Canada, and to pay all customs duties thereon.   The electric locomotives were "towed" through the tunnel, which is under the St. Clair River, and delivered to the St. Clair Tunnel Co. sometime in 1907 in accordance with the terms of the contract.   The total contract price for the locomotives and the installation suitable for their operation amounted to approximately $465,000.   Although, under the terms of the contract, the Westinghouse Electric Manufacturing Co. agreed to pay all customs duties assessed against the locomotives when they entered Canada, there is nothing of record to establish that any such duties were ever paid to the Canadian Government.

It further appears from the record that the tunnel under the St. Clair River is 6,025 feet in length; that the international boundary line between the United States and Canada is approximately in the middle of the tunnel; that the electrified tracks of the St. Clair Tunnel Co. extend for a distance of 11,308 feet from the international boundary line on the United States side and 10,533 feet on the Canadian side; that the six locomotives commenced operation sometime in 1908, and have been used exclusively in international traffic in the so-called "electric zone" which extends from the Sarnia yards in Canada to the Port Huron yards in the United States; that the locomotives have never been used in domestic commerce either in Canada or in the United States; that when in operation they are used to pick up west-bound trains in the Sarnia yard and east-bound trains in the Port Huron yard and deliver such trains to the yard toward which they are bound where they are picked up by steam locomotives and conveyed to their destination.   When not in use, the locomotives are stored in the Sarnia yard, either inside or outside the so-called "electric bay" which is in the roundhouse.

In 1927, three additional locomotives were purchased in the United States by the Canadian National Railway Co.   One of those locomotives was purchased new from the Westinghouse Electric Manufacturing Co., and the other two were purchased from the Chicago, South Bend Railway Co.   The two latter locomotives had been used and, according to the record, had to be "revamped" after they were delivered to the Canadian National Railway Co. in Canada.   When the three locomotives entered Canada they were assessed with duty at the rate of 1 per centum of the regular Canadian customs duty.   The

reason for the assessment of only 1 per centum of the regular customs duty is not made clear by the evidence of record, but was apparently due to the fact that the locomotives were to be under Canadian customs supervision and used exclusively in international traffic. The three locomotives were leased by the Canadian National Railway Co. to the St. Clair Tunnel Co., and were used and operated precisely as were the six locomotives hereinbefore referred to.

During the course of the trial in the court below, counsel for the parties stipulated that the customs duties involved "consist only of duties assessed on major repairs in Canada to the nine locomotives in question, and of materials and labor obtained in Canada, and do not include and no duties were taken upon what is known as running repairs."

It appears from the record that "major repairs" or "heavy repairs" include changing motors and wheels, and that such repairs are made in the electric bay in the roundhouse in Sarnia.

The duties involved in the instant case were assessed when the locomotives in question entered the United States while engaged in international traffic in the manner hereinbefore stated.

Appellant's witness David Cunningham, an accountant for the Canadian National Railway Co., stated that "Under agreement of November, 1922, with the Dominion Government, * * * repair parts entering Canada, after being fabricated or repaired in the United States, are subject to 1 per cent of the duty," and that such parts are entered "ex-warehouse" and remain under Canadian customs supervision.

On the record presented, the trial court held, on the reasoning in its decision in the case of *Detroit & Canada Tunnel Corporation* v. *United States,* 10 Cust. Ct. 32, C. D. 717 (hereinafter discussed), that the heavy repairs here involved were dutiable as assessed by the collector; that appellant had failed to establish the existence of long-continued administrative practice permitting heavy repairs, made in Canada, on locomotives engaged solely in international traffic to be admitted free of duty; and that even if such administrative practice had been established it could not prevail as against the plain statutory provisions of paragraph 1615 (g), *supra.* In support of the latter holding, the court cited the cases of *Pacific Creosoting Co.* v. *United States,* 1 Ct. Cust. Appls. 312, T. D. 31407; *Lloyd Co.* v. *United States,* 9 Ct. Cust. Appls. 280, T. D. 38217; *United States* v. *Field & Co.,* 14 Ct. Cust. Appls. 376, T. D. 42031.

In the case of *Detroit & Canada Tunnel Corporation* v. *United States, supra,* the court held that repairs made in Canada on certain motor busses of United States manufacture, owned by a Michigan corporation and engaged in transporting passengers between Detroit,

Mich., and Windsor, Canada, through a tunnel owned by the Detroit & Canada Tunnel Corp., were dutiable by virtue of the provisions of paragraph 1615 (g), *supra*. It appears from the decision in that case that the motor busses operated partly through the streets of Detroit where passengers coming from Windsor were discharged and those bound for Windsor were picked up, and that they were not permitted to, and did not, engage in any local traffic in Detroit. "At Windsor [the court stated] the busses do not leave the terminal yard" of the Tunnel Corp., "the passengers being landed there and passed through the customs and immigration offices to the street. * * * At Windsor plaintiff maintains a garage, repair shops, and service station and any busses requiring repairs are sent to Windsor for that purpose." The court further stated:

* * * The phrase used in paragraph 1615 (g), *supra*, "exported from the United States for repairs or alterations" *quite obviously implies an intention or purpose to return them to the United States and not an intention to unite them to the mass of things belonging to some foreign country.* [Italics ours.] And the same reasoning would dispose of the objection that they are not "imported" within the meaning of the tariff act. The subdivision under which duty was assessed does not require that they be "imported" but merely that they "may be returned." Indeed, it has been held on the highest authority that the mere bringing of merchandise into this country constitutes an importation. *Cunard* v. *Mellon*, 262 U. S. 100, 121.

We feel fully justified in holding that the busses are "articles" within the meaning of the statute, that they were "exported for repairs," and that they were returned to the United States after such repairs were completed.

It is contended here by counsel for appellant that the locomotives here involved were engaged solely in international traffic; that, therefore, they are not articles, nor were they exported for repairs, within the purview of paragraph 1615 (g), *supra;* and that the repairs in question are not dutiable by virtue of long-continued administrative practice permitting such repairs to be admitted into the United States free of duty.

It is unnecessary that we here cite the various authorities relied upon by counsel for appellant in support of their contentions.

It is well settled that foreign locomotives, *engaged solely in international traffic,* may enter the United States from a foreign country without payment of customs duties. However, should such locomotives be diverted from international traffic and used in local or domestic traffic in the United States, thereby displacing domestic locomotives, they become articles of commerce in this country and subject to customs duties. See article 231 of the Customs Regulations, 1937, *supra,* and *United States* v. *Duluth, Winnepeg & Pacific Railway Co.,* 7 Ct. Cust. Appls. 234, T. D. 36513. See also subsection 5 of section 4 of the Customs Administrative Act of 1938, amending section 308 of the Tariff Act of 1930.

The trial court was of opinion, as we understand its decision, that, as paragraph 1615 (g), *supra*, provides that " 'Any article exported from the United States for repairs * * * may be returned upon the payment of a duty upon the value of the repairs,' it is immaterial whether" the involved locomotives be domestic or foreign, and that the repairs in question were dutiable as assessed.

In view of the fact that foreign locomotives, engaged solely in international traffic, may enter the United States from a foreign country, such as Canada, without the payment of customs duties, it would seem to be clear that heavy repairs made in a foreign country to such locomotives may likewise enter the United States without the payment of customs duties.

It is the view of counsel for the Government that, as the involved locomotives were manufactured in the United States and as they were originally exported to Canada for the sole purpose of being used in international traffic and were never used in local or domestic traffic in Canada, they did not acquire a foreign status, and that, as they are domestic articles, the heavy repairs made in Sarnia, Canada, are subject to the duties assessed against them by virtue of the provisions of paragraph 1615 (g), *supra*.

Whether the involved locomotives acquired a foreign status when they were originally exported to Canada is an interesting question, but, owing to the views we hold, it need not be discussed or decided here. For the purpose of this decision, we assume, but do not hold, that the locomotives in question have never acquired a foreign status.

In order to sustain their position, counsel for the Government must rely on the argument, as they do, that, although the involved locomotives are operated solely in international traffic and when not in operation are stored in Sarnia, Canada, each time the locomotives are subjected to heavy repairs in Sarnia they have been *exported* from the United States for that purpose, and when they reenter the United States they have been *returned* within the purview of paragraph 1615 (g), *supra*.

If the views of counsel for the Government are sound, an anomalous situation is presented—heavy repairs made in a foreign country to foreign locomotives engaged solely in international traffic may enter the United States without the payment of customs duties, whereas heavy repairs made in a foreign country to domestic locomotives engaged solely in international traffic are subject to customs duties by virtue of the provisions of paragraph 1615 (g), *supra*. We cannot bring ourselves to the belief that the Congress intended that the provisions of that paragraph should be construed so as to bring about such an anomalous result, i. e., granting to foreign locomotives engaged solely in international traffic a privilege and benefit not granted to domestic locomotives similarly engaged.

We think the Congress intended that the provisions of paragraph 1615 (g), *supra*, should apply to articles, whether manufactured in, or imported into, the United States, which were exported from the United States for repairs or alterations and returned to the United States as articles of domestic commerce, and that it was not intended that those provisions should apply to locomotives, whether domestic or foreign, which are engaged solely in international traffic.

The involved locomotives have never been used in domestic traffic in this country since they were exported to Canada to be used solely in international traffic, nor were they exported to Canada for repairs or alterations and thereafter returned to the United States as articles of domestic commerce. We hold, therefore, that they were not exported for repairs or returned to the United States within the purview of paragraph 1615 (g), *supra*, and that the heavy repairs to which they were subjected in Canada are not dutiable as assessed by the collector and as held by the trial court.

For the reasons stated, the judgment is *reversed* and the cause *remanded* for proceedings consistent with the views herein expressed.