PACIFIC CREOSOTING CO. *v.* UNITED STATES (Nos. 120 and 121). COLMAN CO. *v.* UNITED STATES (No. 122).[1]

METAL DRUMS CONTAINING CREOSOTE OIL.

The inconvenience likely to follow a decision here will not be allowed to defeat the text and spirit of the law, nor will a previous illegal practice; and the Congress will not be presumed to have intended an importer could bring in free of duty durable metal drums of considerable value containing creosote oil, and mingle these drums when emptied of their contents with other articles of commerce in the trade of the United States; and such metal drum containers are dutiable under section 19 of customs administrative act of June 10, 1890.

United States Court of Customs Appeals, March 13, 1911.

APPEAL from decision of the Board of United States General Appraisers, Abstract 22760 (T. D. 30364).

[Affirmed.]

*George E. De Stieguer* for Pacific Creosoting Co.; *Ira Bronson* and *Trefethen & Grinstead* for J. M. Colman Co., appellants.

*D. Frank Lloyd,* Assistant Attorney General (*Thomas M. Lane* on the brief), for the United States.

Before MONTGOMERY, HUNT, SMITH, BARBER, and DE VRIES, Judges.

HUNT, Judge, delivered the opinion of the court:

These are appeals from a decision of the Board of United States General Appraisers which affirmed the action of the collector of

---

[1] Reported in T. D. 31407 (20 Treas. Dec., 490).

customs at the subport of Seattle, Wash., in assessing duty upon certain metal drums which contained creosote oil. The collector held that the drums were dutiable as manufactures of metal by virtue of that part of section 19 of the customs administrative act of June 10, 1890 (26 Stat., 131), which reads as follows:

If there be used for covering or holding imported merchandise, whether dutiable or free, any unusual article or form designed for use otherwise than in the bona fide transportation of such merchandise to the United States, additional duty shall be levied and collected upon such material or article at the rate to which the same would be subject if separately imported.

There is no dispute as to the fact that creosote oil was free of duty under paragraph 524 of the tariff act of 1897, so that the question becomes this: Was the board correct in its decision that the metal drums used were dutiable as unusual containers for the creosote oil in them, and that they were designed for use otherwise than in the bona fide transportation of the oil to the United States?

Although there are conflicts in some parts of the evidence, nevertheless it is clearly established that prior to 1904 the usual way of bringing creosote oil to the United States was in barrels or tank steamers. Importations by such usual methods have been principally to Atlantic or Gulf points, whence rail shipments were made to the Pacific coast. It is true that between 1890 and 1904 there were several (about three) shipments in metal containers to San Francisco, one of the witnesses for the importers stating that certain metal tanks or coverings were imported to San Francisco with a view to finding what package could be best used and sold after use. Not until February, 1904, was the use of iron drums begun by importers who shipped from England to Seattle.

Iron drums were found to be desirable because they did not leak, and because vessels which would carry perishable freight or freight that might be injured by creosote would carry metal drums, but not barrels, containing creosote oil. But more to the point is the fact that the importers found it was profitable to use metal drums because a market for the drums was found, wherein after being emptied of their creosote oil contents, the drums could be sold advantageously. It appears as a fact from the importers' consular invoices, as well as by the weight of the evidence, that the average cost of the drums as purchased abroad was $5.73 each, while the cost of the oil in each drum was but $4.96. The drums were sold by the importers to the Standard and Union Oil Cos. of the Pacific coast, and by such purchasers used for the shipment of oil in their regular commercial oil business.

The custom of the purchasing oil companies was to mark each drum with a permanent brass plate, upon which was a serial number, so that the drum could be identified and traced. The drums were filled and refilled as commercial needs called for, and when sent out were

charged against customers as of a value of $10 to $12 each, payment of which was expected in case of failure to return the empty drum. It appears that the oil companies found it more economical to buy the imported package from the creosote oil importers than to have like drums made in the United States and shipped to the Pacific coast. After 1904 the importations of oil in barrels decreased in the Seattle district, while that of drums increased, as the subjoined table shows.

*Importations of creosote oil, district of Puget Sound, Oct. 1, 1902, to Dec. 31, 1908.*

| Dates. | Imported in wooden barrels. | Imported in metal drums. |
|---|---|---|
| Oct. 1, 1902, to Dec. 31, 1902 | 42,000 | |
| Jan. 1, 1903, to Dec. 31, 1903 | 131,393 | |
| Jan. 1, 1904, to Dec. 31, 1904 | 146,570 | [1] 291,140 |
| Jan. 1, 1905, to June 30, 1907 | 711,950 | 751,000 |
| July 1, 1907, to June 30, 1908 | 331,279 | 1,098,798 |
| July 1, 1908, to Dec. 31, 1908 | 21,000 | 1,359,012 |
| Total | 1,384,192 | 3,499,950 |

[1] First importation in metal, 500 drums.   (C. E. No. 3562, Feb., 1904.)

It also appears that in 1908, 8,438,660 gallons of creosote oil were imported into the United States, of which 8,173,712 gallons were brought in by tank steamers through New Orleans, 264,948 gallons by tank steamers through New York; that 2,964,487 gallons were imported into the United States in barrels; that 1,214,726 gallons were imported in iron drums, of which 1,098,798 gallons were entered at Puget Sound, Wash. To the importer doing business in the Puget Sound section of the country, leakage, whether in vessel or railway transportation, in handling creosote oil in barrels, is an item of importance, the loss by leakage being sometimes as high as 10 to 12 gallons a barrel, which amounts approximately to 55 cents a barrel.

Admitting the evidence of such decided losses to be accurate, a comparison of the value of two barrels, which is, say, $2, which hold about the same quantity of oil that one drum does, with the cost of the drum at $5.73, it is clear that the importers could only be made whole on the cost of the drum by selling it as an article of merchandise when brought into the United States. An effort was made by one witness for the importers to demonstrate that they lost money in using the drums. The unfavorable result was arrived at, however, by adding to the cost of each drum the cost of handling the same, plus 50 cents for transportation to Seatle. But the result so reached is not satisfactory when it is remembered that whether in barrels or drums the expense of handling must be considered and is about the same.

Then, if we eliminate that item and take the net invoice value of a drum at $5.73 and add 50 cents for transportation from the importers' place of business into Seattle, we have $6.23. Deducting from this amount the average selling price of a drum, $5.50, we find that the

importer has paid 73 cents for the metal drum.  With this showing it becomes hardly necessary to say that two barrels which would by the invoices in evidence cost approximately $2 at the port of shipment, and which by the evidence can not be sold afterwards to hold oil products, and which must be treated as practically of no greater value than 50 cents each after use, will not permit of as much profit to the importer using the barrels with a loss of 55 cents leakage per barrel as would the metal drum with the ready sales market under the conditions already set forth.

It therefore seems only reasonable to say that, while of course the drum is the better container for the creosote oil, it not having been the usual one prior to 1904, the real fact would seem to be that it was only after it was found that such a container could be brought into the United States to be sold for a specific subsequent purpose that the use of such drums became common.  Moved, evidently, by the fact that the drums could be sold to a commercial advantage, the design in the importation of such a container became a dual one—namely, to obtain a good oil container and to bring in a marketable article to be sold by the importers.

But we can not think that Congress, knowing when the tariff law was passed that creosote oil, which was admitted free of duty, was usually imported in tank steamers and barrels, intended that an importer could buy an expensive durable metal drum and thereafter sell the same to be mingled with the mass of things in commerce within the United States, yet escape payment of duty upon the drum merely because it was used for a time in the transportation of creosote oil.

Nor can the argument that for years the customs officers at Pacific coast ports failed to tax metal drums prevail, for the reason that under the evidence, as we read it, the practice of not assessing the duty upon metal drums such as are involved in the case under consideration was clearly illegal and therefore can not be sanctioned without positive violence to the law.

The inconvenience to follow a decision holding that the metal drums are dutiable may cause annoyance to some importers, but can not be allowed to defeat the text and spirit of the law.  Tank steamers and barrels, having been the usual containers, must be resorted to unless the importers are willing to pay the duties incident to the use of metal drums which are dealt in as separate articles of commerce and which are themselves subject to a duty.

In Martindale *v.* Cadwalader (42 Fed. Rep., 403) the court, commenting upon the language of a statute of similar import to that under consideration, said:

> \* \* \* It was intended not to exempt any part of the merchandise, anything that could be dealt in as merchandise, bought and sold, from duty, but to exempt simply the coverings, the means of securing safety in transportation; and if a party

in importing merchandise used a package or box or covering designed for some other use, as well as for the importation, and thus designed to evade the revenue laws of the United States, he should be subject to the high rate of duty on the box or covering provided for by this section.    * * *

The decision of the board is *affirmed.*

MONTGOMERY, Presiding Judge, and SMITH, BARBER, and DE VRIES, Judges, concur.