(C. D. 226)

Eurasia Import Co., Inc. *v.* United States

United States Customs Court, Third Division

(Decided October 11, 1939)

*James W. Bevans* for the plantiff.

*Webster J. Oliver*, Assistant Attorney General (*Daniel G. McGrath* and *Joseph F. Donohue*, special attorneys), for the defendant.

*Lamb & Lerch, amici curiae.*

Before CLINE and KEEFE, Judges

CLINE, Judge: In this case six suits were consolidated for trial. The plaintiff protested against the action of the collector of customs at the port of New York in refusing to release from customs custody certain wool felt hoods or hat bodies unless they were individually marked to indicate the country of origin thereof. With the excep-

tion of the entry numbers, the protests are identical and read as follows:

> Protest is hereby made against your action in refusing to release from customs custody the merchandise imported by us, and entered for warehouse under the above entry number. It is our claim that such refusal is wholly improper, unauthorized, and without legal warrant.
>
> We also give notice of our dissatisfaction with your finding that this importation is not properly marked. It is our claim that the marking is the same as has been the practice during the past ten years and more, and has always been accepted as conforming to legal requirements.
>
> It is our further claim that these articles are entitled to exemption because they are so substantially changed after importation, through further processing in this country, that they become products of the United States; and further, because under the established policy with respect to any ruling which results in a change of practice, we are entitled to notice of such ruling, and thereafter to a reasonable period of grace within which to make the necessary preparations for compliance with such ruling (T. D. 45442, T. D. 45660).
>
> It is our further claim that these articles are entitled to exemption from the marking requirements under section 304 (a) (3) (C) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938. This claim is more fully set forth in our petition of August 27, 1938, which is already on file with you and which we hereby adopt as an integral part of this protest.

We have examined the papers in all of the protests and fail to find the petition of August 27, 1938, which is mentioned in the last paragraph of the protest.

Warehouse entries were made for the shipments herein involved, and, at the time of trial, the goods remained in warehouse. The method of marking the merchandise is governed by the provisions of section 304 of the Tariff Act of 1930, as amended by section 3 of the Customs Administrative Act of 1938.

At the trial two witnesses appeared for the plaintiff and six for the defendant. A sample of the goods in the condition as imported was received in evidence and marked "Exhibit 1." It consists of a bundle wrapped in paper containing 10 dozen hoods or hat bodies. The individual articles are not marked so as to indicate the country of origin thereof, but the paper-covered bundle contains the legend "Made in Italy." The testimony shows that the merchandise is imported in bales containing six to nine bundles like Exhibit 1. A piece of burlap said to be a covering from a bale identical to those on the articles herein involved was admitted in evidence and marked "Exhibit 2." It is marked with the legend "Made in Italy." The testimony established that the marking on all of the merchandise in the importations herein involved was similar to that on Exhibits 1 and 2.

Numerous illustrative exhibits of hoods and of finished hats, some unmarked and others containing marking of various kinds, were also introduced in evidence. Some of these exhibits are marked with the word "Italy" in calcimine and others, produced in the United States,

are marked with a decalcomania label attached to the inner surface of the articles inside the crown.

The plaintiff called Mr. Reuben Goldberg, who testified that he is the secretary of the importing company, the business of which is importing both felt and straw hat bodies and selling them in the United States; that the firm has been in business since 1935 and that personally he had been in the same line of business since 1930 or 1931; that until a short time before the date of the trial he had never received any imported hoods which had been individually marked with the name of the country of origin and the customs officers had not required that they be marked before release; that the company with which he is connected does not manufacture hats from the imported hoods but sells them to the manufacturers. He testified further that he was in Italy from June 23rd to August 25th, 1938, and learned while there that it would be necessary to have the hoods individually marked; that he requested the manufacturer to mark the hoods covered by these shipments but the manufacturer lacked the facility for marking with a decalcomania and the only way the work could be done in Italy at that time was with calcimine which would not remain on the bodies during the process of manufacture into finished hats in the United States, so he ordered the articles shipped to the United States with no marking thereon, except the marking on the containers. On cross-examination he admitted that hoods having the name of the country of origin marked thereon in calcimine have been coming into the United States.

The plaintiff then called Mr. Jacob Finer, who is a manufacturer of hats, using imported hoods similar to Exhibit 1. He testified that in the process of manufacture it is necessary to soak the bodies in water overnight; that thereafter they are frequently "pounced" on both the inside and the outside, which is a sort of sandpapering process to reduce the thickness of the fabric and render it more pliable; that then they are buffed to create a shine on the surface; that this process of soaking, heating, pouncing, and buffing would remove any calcimine marking which the hats might have at the time of importation; that the bodies are then shaped into hats by pulling or blocking over heated metal dies. Hats made from imported bodies were marked in evidence as "Illustrative Exhibits B and C." An imported body marked in calcimine with the word "Italy" on the inside of the crown was received in evidence and marked "Illustrative Exhibit D."

The plaintiff introduced, as "Illustrative Exhibit J," a communication from the Division of Foreign Trade Statistics showing that wool felt hoods had been imported in substantial quantities during the 5-year period ending January 1, 1937.

The first witness called by the defendant was Mr. Charles Katz. He testified that he is employed by the Westbrook Hat Co.,

where hats are produced from hoods like Exhibit 1 and that the process of manufacturing the finished hats included steaming the hat body to shape and form, blocking the brim and crown, drying the hat, trimming and packing; that there was no occasion to "pounce" or buff the inside of the crown in the manufacture of any of the three or four hundred different styles with which he was familiar. He testified further that the hoods in Exhibit 1 were completely "pounced," as were most imported hat bodies, and that no purpose could be served by making the crown thinner.

The next witness for the defendant was Mr. Maurice Lewis, who is sales manager of the body sales division of the Merrimac Hat Corporation, a manufacturer of wool hat bodies. He testified that in the course of his sales experience he had visited thousands of millinery plants during the past 25 years and had seen bodies like those herein involved being used during the past 2 years in the millinery trade; that such bodies are never "pounced" in the millinery factories, because that process has been completed prior to importation. The witness produced a hat body, marked in evidence as "Illustrative Exhibit H," which had been marked with the legend "Made in U. S. A." before being subjected to processes of soaking, steaming, and blocking, which processes are incidental to the manufacture of hats and the marking appears in the finished hat. He testified that the marking legend in the crown had been applied to the hood by a decalcomania which is known as a "Kaumagraph" and was stamped on the inside of the hat body by an automatic machine with the aid of heat and pressure.

The defendant called as additional witnesses, Mr. William S. Rowe, Jr., Mr. John D. Mohn, and Mr. Abe Rubenstein, who testified substantially the same as witnesses Katz and Lewis. Mr. Mohn testified also that the cost of marking hoods with the Kaumagraph label was five-sixths of a cent per dozen and that the value of the hoods was between $3.40 and $3.65 per dozen.

The defendant called Mr. George M. Porges, Vice President of the Kaumagraph Company, who testified that his concern manufactures the transfers used in marking hat bodies by the use of the machines and that the Kaumagraph transfers were offered for sale in Italy at prices ranging from 40 to 50 cents per thousand on July 14, 1938. He testified further that in 1928 his firm established a plant in Manchester, England, and that similar marking transfers are sold throughout Europe as well as in the United States.

No testimony was introduced showing the cost of marking hoods by the use of calcimine.

Plaintiff, defendant, and *amicus curiae* filed excellent briefs which have aided the court materially in determining the issue.

174

Counsel for the plaintiff contends in his brief that the action of the Treasury Department in refusing delivery of the felt hat bodies or hoods on and after July 25, 1938, unless individually marked so as to indicate the country of origin thereof, was arbitrary, unreasonable, and not warranted by the provisions of the Customs Administrative Act of 1938.

Counsel for the defendant contends that under the statute in effect at the time of importation or attempted withdrawal (section 304 (a) of section 3 of the Customs Administrative Act of 1938), the individual articles were required to be marked, since they were capable of being marked and had not been excepted from marking by regulations, and that the importer had no vested right to the issuance of a regulation exempting such articles from marking. The pertinent provisions of the statute read as follows:

SEC. 304. MARKING OF IMPORTED ARTICLES AND CONTAINERS

(a) MARKING OF ARTICLES.—Except as hereinafter provided, every article of foreign origin (or its container, as provided in subsection (b) hereof) imported into the United States shall be marked in a conspicuous place as legibly, indelibly, and permanently as the nature of the article (or container) will permit in such manner as to indicate to an ultimate purchaser in the United States the English name of the country of origin of the article. The Secretary of the Treasury may by regulations—

\* \* \* \* \* \* \*

(3) Authorize the exception of any article from the requirements of marking if—

(A) Such article is incapable of being marked;

(B) Such article cannot be marked prior to shipment to the United States without injury;

(C) Such article cannot be marked prior to shipment to the United States, except at an expense economically prohibitive of its importation;

(D) The marking of a container of such article will reasonably indicate the origin of such article;

(E) Such article is a crude substance;

(F) Such article is imported for use by the importer and not intended for sale in its imported or any other form;

(G) Such article is to be processed in the United States by the importer or for his account otherwise than for the purpose of concealing the origin of such article and in such manner that any mark contemplated by this section would necessarily be obliterated, destroyed, or permanently concealed;

(H) An ultimate purchaser, by reason of the character of such article or by reason of the circumstances of its importation, must necessarily know the country of origin of such article even though it is not marked to indicate its origin;

(I) Such article was produced more than twenty years prior to its importation into the United States; or

(J) Such article is of a class or kind with respect to which the Secretary of the Treasury has given notice by publication in the weekly Treasury Decisions within two years after July 1, 1937, that articles of such class or kind were imported in substantial quantities during the five-year period immediately preceding January 1, 1937, and were not required during such period to be marked to indicate their origin: Provided, That this subdivision (J) shall not apply after September 1, 1938, to sawed lumber and timbers, telephone, trolley, electric-light, and telegraph poles of wood, and bundles of shingles; but the President is authorized to suspend the effectiveness of this proviso if he finds such action required to carry out any trade agreement entered into under the authority of the Act of June 12, 1934 (U. S. C., 1934 edition, title 19, secs. 1351–1354), as extended.

The record shows that the articles are capable of being marked, either with calcimine, which marking has been accepted by customs officers, or with decalcomania transfers, and the only question involved is whether the articles should be excepted from the marking provisions by the Customs Regulations.

The statute does not say that the Secretary of the Treasury *must* authorize the exception of the marking of merchandise of the kind that has previously escaped marking. It says that the Secretary *may* by regulation authorize the exception. The statute gives the Secretary authority to exercise his discretion to except articles from marking under certain prescribed circumstances. If the Secretary does not deem it advisable to promulgate a regulation excepting any particular article from marking under the authority of the provisions of the statute above quoted, it is not within the province of this court to constrain him so to do.

The plaintiff draws attention particularly to section 304 (a) (3) (J) and points out that the evidence in this case shows that felt hoods like those in Exhibit 1 were not required to be marked for more than 5 years prior to January 1, 1937. The plaintiff's witness did not state the port of entry in which the unmarked hoods were received, but, as the witnesses were located in New York, we assume they were testifying to the practice at that port.

An examination of section 304 (a) of the Tariff Act of 1930, which was in force prior to the enactment of the Customs Administrative Act of 1938, indicates that the power of the Secretary to except an article from marking was limited to a case in which he was satisfied that—

such article is incapable of being marked, stamped, branded, or labeled or cannot be marked, stamped, branded, or labeled without injury, or except at an expense economically prohibitive of the importation, or that the marking, stamping, branding, or labeling of the immediate container of such article will reasonably indicate the country of origin of such article.

Under the authority of that statute the Secretary of the Treasury promulgated exceptions to the marking requirement, in article 513 of the Customs Regulations of 1931, of—

(1) Articles entered for immediate exportation or in transit through the United States to a foreign country.

(2) Articles the manufacture or production of the Philippine or Virgin Islands; but articles of foreign manufacture or production imported into those islands and reshipped to the United States are subject to all marking requirements applicable to merchandise imported from a foreign country. (As amended in T. D. 47730.)

(3) Articles of trifling value or for the personal use of the importer or for use in his home, factory, or place of business and not intended for sale.

(4) Articles of antiquity specified in paragraph 1811 of the tariff act.

(5) Crude substances or materials. (As amended in T. D. 48489.)

(6) Merchandise which is to be substantially changed in the importer's plant or for his account by further processing or manufacture which would obliterate or destroy such marking.   (As amended August 20, 1936, T. D. 48489.)

Felt hoods of the kind covered by the importations herein involved do not seem to be covered by any of the exceptions in article 513 above quoted, unless they come within paragraph (6).   The testimony indicates, however, that importers of wool felt hoods were not required by the customs officers, who we assume were located at the port of New York, to be marked for more than 5 years prior to January 1, 1937.   The record does not show that such practice existed throughout the country.   The regulation in paragraph (6) did not become effective until August 20, 1936, and that regulation would not cover articles imported by a merchant who sells the goods to manufacturers in the United States.   We have not been referred to any other regulation under the Tariff Act of 1930 prior to August 20, 1936, which would except the marking of such merchandise under the conditions specified.   In fact, in *Massce & Co., Inc.* v. *United States*, Abstract 27993, 65 Treas. Dec. 1516, the court held that cotton cloth, imported prior thereto, which was consumed in the factory of an importer in making pajamas, was required to be marked.

If there was no authority under the provisions of section 304 (a) of the Tariff Act of 1930 for permitting imported hoods to pass through the customs without marking, the fact that the collector did permit the importation thereof without their being marked is not sufficient to constrain the Secretary to continue that practice under the amendment in section 304 (a) (3) (J) of the Customs Administrative Act of 1938.   In the case of *Lloyd Co.* v. *United States*, 9 Ct. Cust. Appls., 280, T. D. 38217, the court held that an incorrect practice of twenty years' standing formed no basis for a continuance of that practice. The court said:

> The testimony discloses the fact that for perhaps 20 years last past such importations as these have been held by the collector to be free of duty probably upon the grounds now urged by the appellant.   We do not overlook the importance of this fact as an element in the case, but it should not lead us to constrain the collector to continue a course which we regard as plainly contrary to the provisions of the act.   *Pacific Creosoting Co.* v. *United States* (1 Ct. Cust. Appls., 312; T. D. 31407).

Section 304 (a) (3) (J) authorizes the exception of marking of articles in cases where the Secretary of the Treasury has given notice 2 years after July 1, 1937, of articles which were imported in substantial quantities during the 5-year period immediately preceding January 1, 1937, and were not required during such period to be marked to indicate the country of origin thereof.   Our attention has been directed to such notices published in T. D. 49690, T. D. 49835, and T. D. 49896, but felt hoods of the kind herein involved are not included in the lists of articles therein published.   Under the provi-

sions of the law, the Secretary of the Treasury has the sole power to give notice to invoke this provision of the statute, and, if the Secretary does not publish such a notice covering a particular article, this court is powerless to hold that an article comes within the exception, even though testimony be introduced before the court showing that the same class of merchandise was not required to be marked by the customs officers during the 5-year period preceding January 1st, 1937.

The same principle was involved in *Buhl-Mills Co. et al.* v. *United States*, T. D. 31349, 20 Treas. Dec. 387, and in *Robert Dunlap* v. *United States*, 173 U. S. 65. In the *Buhl-Mills Co.* case, *supra*, the Board of United States General Appraisers (now the United States Customs Court) held that the plaintiff was not entitled to an allowance in duty because part of an importation of fruit was rotten, where the Secretary of the Treasury was authorized to prescribe regulations exempting unmerchantable goods from duty but had not done so. In that case the regulations under which the importer claimed had actually been issued but at a date subsequent to the importation of the merchandise under protest. The court held that the merchandise was not covered by the regulations because they were not in effect at the date of importation.

In *Robert Dunlap* v. *United States*, *supra*, a claimant had urged before the United States Court of Claims that he was entitled to a rebate of an internal-revenue tax which he had paid on alcohol. It was admitted that the alcohol was used in the manufacture of a "product of the arts." Exemption from the tax imposed was claimed under a statute which authorized the Secretary of the Treasury to issue regulations governing the use of alcohol for such purposes, upon compliance with which the claimant would be entitled to a refund of the taxes paid. The Secretary did not issue the regulations during the period for which refund was claimed. The United States Supreme Court affirmed the judgment of the Court of Claims which denied the rebate. The court said:

> It is true that the right to the rebate was derived from the statute, but it was the statute itself which postponed the existence of the right until the Secretary had prescribed regulations if he found it practicable to do so.
>
>    *       *       *       *       *       *       *
>
> All this, however, only tends to sustain the conclusion of the Court of Claims that this was not the case of a right granted *in praesenti* to all persons who might, after the passage of the law, actually use alcohol in the arts, or in any medicinal or other like compounds, to a rebate or repayment of the tax paid on such alcohol, but that the grant of the right was conditioned on use in compliance with regulations to be prescribed, in the absence of which the right could not vest so as to create a cause of action by reason of the unregulated use.

Counsel for the plaintiff contends also, in his brief, that the articles herein involved are excepted from marking by subparagraphs (D) and

(H) of section 304 (a) (3) of the Customs Administrative Act of 1938 which are quoted above.

After the enactment of the new provisions, the Secretary of the Treasury promulgated amendments to the Customs Regulations of 1937 to conform with the changes in the law; these amendments were published in T. D. 49658. In article 532 (a) the provisions of section 304 (a) (3) of the statute are quoted; article 532 (b) reads in part as follows:

> (b) Articles coming within the classes of merchandise specified above are hereby exempted from the requirement of marking. The marking of the container of an article will reasonably indicate the origin of such article within the meaning of section 304 (a) (3) (D), Tariff Act of 1930, if the container is sealed and the article is usually sold to the ultimate purchaser without the container being opened to make the article readily available for inspection.

The regulation appears to be reasonable and consequently has the force of law. In *Gibson-Thomsen Co., Inc.* v. *United States*, C. D. 117, the court construed the words "ultimate purchaser" as meaning "the ultimate purchaser of the imported article" and not to mean "the ultimate purchaser of another article made from the imported article." In this case, however, the plaintiff failed to offer any proof showing the condition of the merchandise at the time it is sold to the ultimate purchaser, as provided in the regulation relating to subparagraph (D), or any characteristics it may have which would indicate to the ultimate purchaser the country of origin thereof, without marking, in order to invoke subparagraph (H). As there is an entire failure of proof with respect to the claim under subparagraphs (D) and (H), the applicability thereof cannot be considered.

Counsel for the plaintiff contends further that the collector instituted a change in practice when he required that wool felt hoods should be individually marked and that the Treasury Department should have published a notice thereof giving the importers 60 days notice before the change became effective. The plaintiff cites T. D. 44987, T. D. 45267 (2), T. D. 46796 (7), T. D. 46595 (13), T. D. 48833 (33), and T. D. 49140 (9) as illustrations of cases where 60 or 90 days were permitted before a change in practice should take effect. Plaintiff urges that Congress was fully aware of this practice and therefore it must be considered that such practice received congressional approval.

It is well settled that the rule governing the acceptance of long-continued administrative practice as a determinative factor is limited to cases where the meaning of the statute is doubtful. This is shown by the following excerpt from the opinion of the court in *Coty Processing Co., Inc.* v. *United States*, 23 C. C. P. A. 117, T. D. 47768:

> However, assuming, without deciding, that long-continued administrative practice has been established in classifying articles like those here involved as entireties, the rule is well established that administrative practice is determinative

only when the meaning of a statute is doubtful. *United States v. Jules Raunheim (Inc.) et al.*, 17 C. C. P. A. (Customs) 425, T. D. 43867.

We find nothing in the paragraphs of the Tariff Act of 1930 here under consideration, or elsewhere in said act, which makes the question of the proper classification of the merchandise here involved doubtful, and hence the rule of long-continued administrative practice has no applicability herein.

It is not contended that the meaning of the statute involved in this case is doubtful. Therefore, assuming, without deciding, that long-continued administrative practice in the marking requirements for merchandise like that in Exhibit 1 has been established, the rule that administrative practice is controlling is not applicable in this case.

The statute prevents the collector from using his discretion in exempting merchandise from the marking requirement. If there was a change in practice in regard to the marking of wool felt hoods, as contended by the plaintiff, it was brought about by a change in the law. Under the terms of section 37 of the Customs Administrative Act of 1938 the marking provisions did not take effect until thirty days after the enactment of the law. Therefore the importers did have notice thirty days before the new provisions became effective.

The only publication concerning the marking of hats brought to our attention is T. D. 49763 (6) which is an abstract of a decision of the Commissioner of Customs of December 6, 1938 (which is after the protests herein were filed), directing that hats, wholly or partly manufactured, of the classes or kinds described in paragraphs 1504 and 1505, Tariff Act of 1930, except harvest hats, should be required to be marked in as permanent a manner as the nature of the article will permit, even though such marking may eventually be obliterated or destroyed by the processing to which the article is ordinarily subjected in the United States, unless it is found that the articles come within one of the exceptions from marking provided for in section 304 (a) (3) (A) to (I), inclusive.

No provision of the statute has been cited requiring the Secretary of the Treasury to give notice of a change in practice except section 6 of the Customs Administrative Act of 1938 which contains the following:

No administrative ruling resulting in the imposition of a higher rate of duty or charge than the Secretary of the Treasury shall find to have been applicable to imported merchandise under an established and uniform practice shall be effective with respect to articles entered for consumption or withdrawn from warehouse for consumption prior to the expiration of thirty days after the date of publication in the weekly Treasury Decisions of notice of such ruling; but this provision shall not apply with respect to the imposition of antidumping duties.

The above provision is not applicable in this case for it applies to cases only where an administrative ruling would result in the "imposition of a higher rate of duty or charge than the Secretary of the Treasury shall find to have been applicable to imported merchandise

under an established and uniform practice." The rate of duty is not involved in this case. All that was demanded by the collector is that the importer mark the goods. Section 304 (c) does not impose an additional duty when goods are legally marked either before or after importation. Furthermore, the plaintiff complains because the Secretary of the Treasury failed to make a ruling exempting the articles from marking and the provision does not cover such a contingency.

Counsel for the plaintiff contends further, in his brief, that the collector was unauthorized to refuse delivery of the goods which were in bonded warehouse but which were not designated for examination by the appraiser because goods in bonded warehouse are not in customs custody and the statute limits the authority of the collector to withhold delivery of unmarked goods to merchandise "held in customs custody for inspection, examination, or appraisement." The provision reads as follows:

SECTION 304 (d). DELIVERY WITHHELD UNTIL MARKED.—No imported article held in customs custody for inspection, examination, or appraisement shall be delivered until such article and every other article of the importation (or their containers), whether or not released from customs custody, shall have been marked in accordance with the requirements of this section or until the amount of duty estimated to be payable under subsection (c) of this section has been deposited. Nothing in this section shall be construed as excepting any article (or its container) from the particular requirements of marking provided for in any other provision of law.

According to the provisions of the section quoted, the collector is directed to withhold delivery of all unmarked imported articles "held in customs custody for inspection, examination, or appraisement" until such article and every other article of the importation (or their containers) shall have been marked. It is well settled that goods in bonded warehouses are in customs custody when the duty is unpaid and no permit of delivery has been issued by the collector. *Hartranft* v. *Oliver*, 125 U. S. 525; *United States* v. *Cronkhite*, 9 Ct. Cust. Appls. 129, T. D. 37980. Furthermore, Congress clearly intended that goods in bonded warehouse shall be in charge of an officer of the customs as indicated by the following provision in section 555 of the Tariff Act of 1930:

SEC. 555. * * * Except as otherwise provided in this Act, bonded warehouses shall be used solely for the storage of imported merchandise and shall be placed in charge of a proper officer of the customs, who, together with the proprietor thereof, shall have joint custody of all merchandise stored in the warehouse; * * *

The plaintiff produced no evidence in this case tending to show that an attempt was made to withdraw only the particular cases which were not designated for examination. Therefore, the record does not show that the merchandise which the plaintiff desired to withdraw was not "held in customs custody for inspection, examination, or

appraisement" and the facts of record are not sufficient to warrant a consideration of the point raised.

Counsel for the plaintiff contends further in his brief that the importer was entitled to a release of the merchandise contained in the packages held for inspection, examination, or appraisement upon the payment of a deposit equal to the estimated duty computed at the rate of 10 per centum ad valorem under the provisions of section 304 (c) of the Customs Administrative Act of 1938. That claim is not made in the protest. Furthermore, it is unsupported by the evidence, as plaintiff failed to introduce testimony showing that he tendered the estimated marking duty to the collector and that thereafter the collector refused to issue a permit of delivery of the unmarked merchandise. For all that appears in the record, the collector may not have made a decision on that point. Therefore there is no decision of the collector on that phase of the case which is before the court for consideration.

The protests are overruled. Judgment will be entered in favor of the defendant.