(C. D. 705)

THOS. COOK & SON—WAGONS-LITS, INC. v. UNITED STATES

United States Customs Court, Third Division

(Decided November 9, 1942)

*James W. Bevans* for the plaintiff.

*Paul P. Rao*, Assistant Attorney General (*James F. Donnelly* and *Joseph F. Donohue*, special attorneys), for the defendant.

Before CLINE, KEEFE, and EKWALL, Judges

KEEFE, Judge: The question in this case arises under the provisions of paragraph 328, Tariff Act of 1930, imposing a duty of 25 per centum ad valorem upon cylindrical and tubular tanks or vessels, whether full or empty.

The shipment in question consisted of 260 drums of cod-liver oil from Iceland. Out of this lot 130 drums were sold to E. R. Squibb & Sons and delivered to that company directly from the dock. The remaining 130 drums were received at the premises of the White Laboratories, Inc., and subsequently sold to Charles L. Huisking & Co., Inc. The latter company sold the drums in the condition received except 10 or 15 drums which were leaking and the contents were repacked in other containers.

The plaintiff contends that said drums are not within the terms of paragraph 328 because they are not constructed to be competitive with American drums and not intended for that purpose, being composed of a light material and known as one-time shippers, not designed for more than one trip. Further, it is contended that the drums in question are the ordinary and usual containers of a duty-free merchandise and consequently free of duty notwithstanding a fugitive use of a few drums by someone obtaining possession of them after being discarded. Further, it is contended that the drums are dutiable in the condition in which imported; that in such condition they are incapable of re-use and after the contents are removed have a value only as scrap metal; and that in order to be resold they undergo a process so elaborate that the original drums constitute merely material to be used for purposes of remanufacture.

The Government contends that if these drums are used·again after being emptied of their contents the chief use of the class or kind of such or similar drums in the United States is the criterion by which classification is governed. It is urged that it is immaterial whether

or not the drums are known as one-time shippers and that the specific use of the particular drums in this case should not be controlling. It is further contended that if for any reason good, substantial drums happen to have been destroyed immediately after the removal of their contents, they are still within the class of dutiable drums; that as to these particular drums the deliberate mutilation thereof after importation does not remove them from a dutiable status if they are dutiable when not mutilated; and that neither the drum contents nor the manner in which such contents are removed from these drums precludes their re-use in the United States.

Representatives of White Laboratories, the importer herein, E. R. Squibb & Sons, and C. L. Huisking & Co. testified upon behalf of the importer.

The importer's representative testified that the drums in question were light, weighing only 48 pounds, and were one-time shippers in fair condition, the top of the drums having bungs through which the contents could be removed; that drums intended for repeated use weigh upon the average about 70 pounds each; and that the drums with the contents in this shipment were sold.

Squibb's representative testified that his company received 130 of the drums herein; that the drums were emptied of their contents by means of a side pump and in the removal thereof mutilation of the drums was not necessary; that he was instructed to destroy the drums and in compliance with his instructions a hole was knocked in the head of each drum with a fire axe; and that after damaging the drums they were disposed of, without charge, as old iron to junk dealers, one of whom was Tatarka Brothers. That his company was holding a quantity of these empty drums, in undamaged condition, in their storage warehouse, having been stored empty for purposes of sale in the event the Government found them to be dutiable. The witness further testified that in comparison with American drums the foreign cod-liver oil drums were lighter in construction; and that one-time shippers are drums that can be used once only as containers. A receipt of Tatarka Brothers, dealers in steel drums, was admitted in evidence as exhibit 1, showing that on February 7, 1941, 400 55-gallon cod oil drums "damaged unfit for container use" were delivered to Tatarka Brothers free of charge.

Huisking's representative testified that the term "one-time shippers" indicates drums of such type as will carry the weight of its contents for about one trip without any hazard to the contents; that the drums here in question were one-time shippers consisting of 18-gauge material; that his company uses drums that are not one-time shippers weighing from 70 to 110 pounds; that the all-purpose container is bought according to the gauge of the steel and his company has never purchased empty drums of the character here involved.

The witness further testified that as containers of merchandise foreign drums of this character constitute a tare of 48 to 50 pounds and that American drums, known as one-time shippers of the same type, constitute a tare of 50½ to 52 pounds.

The Government produced five witnesses including the sampler who examined the drums and took samples of the contents. He testified that the drums were of the character of drums always shipped from Iceland and in his opinion the drums were approximately the same externally as olive oil drums.

Andrew Tatarka, who had purchased empty cod-liver oil drums from Squibb, testified that he had been a dealer in second-hand drums for 20 years, having bought and sold the same as second-hand drums; that he recalls the purchase of 400 drums of 55-gallon capacity from Squibb, but was unable to testify as to their disposition because they were mixed with other drums; that if too many drums of that type accumulate in his yards the heads are taken out and they are sold for scrap; that it does not really pay him to salvage a damaged drum because of the amount of labor involved; that when he has a shortage in a quantity required to fill an order then such drums are repaired; that the drums received from Squibb had a pick-axe hole in them varying in size from an inch and a half square to two inches and others were ripped with a fireman's axe, the cut extending from two and a half to three inches long and a quarter inch wide; that to repair such mutilated drums a patch is put on the slit and it is welded and after repair they are sold as the lowest grade second-hand drums; that such drums are used for "cut-back" and other material such as tar and road oil; that he loses money on every damaged drum salvaged; and that upon an order for one thousand drums probably 25 per centum of salvaged drums would be used.

The witness further testified that he sells such drums for use as containers and he has seen them so used; that a lot of drums sold by him would include domestic drums previously containing paint, varnish, olive oil, latex, and also a mixture of foreign drums; that in selling such drums there are no specifications as to the gauge of the steel; that if drums are plentiful those with holes in the top are disposed of as scrap; and that when receipting for Squibb's drums he meant by the notation "Damaged unfit for container use" that such drums would only be used in an emergency and that he received them as scrap metal, not drums, because to re-use as containers it would cost 60 cents to reweld a drum including the cost of testing and cleaning while the value thereof delivered is from 90 cents to $1.10; that such drums not requiring rewelding would be worth to him around 40 or 50 cents each, while as scrap metal such drums are worth about 20 or 25 cents and when the heads are removed about 35 cents.

The purchasing agent for the Newark Steel Drum Co. testified that he is in the business of reconditioning and reselling used steel drums; that he has bought second-hand, 18-gauge, 55-gallon drums of foreign as well as domestic origin; that, after purchasing, they are processed by cleaning, testing, welding leaks, and repainting; and that there are several grades of drums, to wit, number 1 grade being a drum that is not dented, or with very slight dents, clean, suitable for re-filling with most any liquid; number 2 grade, having slight dents and perhaps slightly rusted; and number 3 grade, badly dented and quite rusty. In preparing a drum for resale the witness testified that if badly dented the dents are removed by hydrostatic pressure, although the small dents are not removable; that, after de-denting, the drum is cleaned with a chemical solution to remove the oil or previous contents, the rust is removed and the drum treated to prevent further rust, and finally it is subjected to a hot-air drier; and that the same treatment applies to foreign as well as domestic drums, although foreign drums require more work in order to be salable.

The witness further testified that the 18-gauge, 55-gallon drum of American manufacture is fairly uniform and is built to pass the Inter-state Commerce Commission's specifications; that such domestic drum is sold for re-use for the same purposes as the foreign drum; that his company has processed and resold every type of foreign drum on the market, estimating that since he has been in business he has bought approximately a million foreign drums of 18-gauge, 55-gallon capacity; that his company has processed and resold such drums principally to the tar trade, asphalt trade, and to certain chemical companies, but generally such foreign as well as American recondi-tioned drums are sold as containers for a low-grade product.

The witness was shown an empty cod-liver oil drum and asked to describe it. He stated that it was an "Iceland Squatt" such as he had purchased and sold as having previously contained cod-liver oil or other fish oils and that such drums were embossed upon the side with the word "Iceland" in the same manner as the drum shown him; that in his experience he had never handled drums from Iceland previously containing cod-liver oil that differed from the drum before him except in former years they were taller and narrower. The witness admitted he had not seen the drums imported herein.

Government counsel offered the drum in evidence. However counsel for the plaintiff objected to the admission upon the ground that the witness was unable to connect the drums he had purchased with the particular drum before the court and was unaware of the condition of the imported drums herein. Objection to the admission of the drum was sustained by the court and it was marked in evidence as illustrative exhibit A for identification.

Counsel for the Government offered in evidence an 18-gauge, 55-gallon American-made drum which was received in evidence without objection as illustrative exhibit B.

The witness further testified that illustrative exhibit A for identification is the type of drum known in his business as 18-gauge, 55-gallon Iceland drum containing cod-liver oil, and that illustrative exhibit B was similar in physical characteristics to the Iceland drum, and such American drum is embossed with the gauge, capacity, and year of manufacture together with the manufacturer's initials.

The witness further testified that the foreign drum of 18-gauge, 55-gallon capacity would cost him from 25 cents to $1, depending on the condition of the lot; that he had always paid between those figures according to market conditions; that in the last 3 or 4 years the average foreign drums have cost about 50 cents or a little less for 55-gallon capacity on the average for the three grades; that he has bought such drums from other dealers and has also hauled them himself; and that the price as scrap metal was from 15 cents to 45 cents per hundred, or approximately 7½ to 22 cents per drum. That cod-liver oil drums are cleaned by putting the drum upon a set of jets on which there is a pump and a tank of hot alkaline solution; that the solution is pumped into the drum and flows out by gravity back into the tank and recirculated; that it has not been necessary to subject all drums to the acid wash, and that in his experience the 48-pound, 18-gauge, 55-gallon drums are customarily used and re-used as containers.

A. D. Murphy, employed by the Standard Oil Co. of New Jersey, testified that he purchases all containers in his plant from 1-pint cans to 55-gallon drums; that during the last 6-year period he has had occasion to purchase approximately 70,000, 18-gauge, 55-gallon drums a year; that he is familiar with illustrative exhibit A for identification and illustrative B, as they are of the same character of drums he purchases; that if he wants drums for lubricating oils he specifies number 1 grade, steel, second-hand drums of 18-gauge, 55-gallon capacity, to be painted with a particular color combination, free and clean of moisture and other foreign material; that number 2 grade is used for inferior grades of lubricating oils and black oils made from asphaltic bases; and number 3 grade is used for cutback asphalts, or semisolid asphalts; and that merchandise in these three grades of second-hand drums is shipped by his company practically all over the world.

The witness further testified that the terms "single-trip container" or "one-time shipper" originated with the Interstate Commerce Commission classification of drums for certain products, particularly those that were inflammable, and for such products a one-time shipper was only supposed to be used once. The term was not intended to extend

beyond such products and on lubricating oils and on products "of a flash over 80 degrees Fahrenheit," the term "one-time shipper" has no significance. The Standard Oil Co. uses reconditioned drums bearing the embossing "S. T. C." for lubricating oils and other products, including such drums with welded spots if the weld is not more than 1 inch; that his company purchases reconditioned cod-liver oil drums from second-hand drum dealers and in making such purchases he never received any such drums with a skim of cod-liver oil on the inside or rusty drums, that the supplier cleans and paints the drums ready for filling, being particularly careful of numbers 1 and 2 drums, but with the number 3 grade his company is more lenient as that grade is used for asphalt; that the heavier drums are company-owned and their customers empty and return them, whereas the 18-gauge drum is sold with the contents and becomes the property of the purchaser; that the lighter drums are not required to be returned because his company is not equipped to recondition that type of package; and that an entirely different process is used in reconditioning the heavier drums because they do not become dented and all that is required is to steam them out, dry them, and repaint the heads.

N. A. Lebowich, sales manager and vice president of the Acme Steel Drum Co. of Newark, N. J., testified that his company buys and sells second-hand drums and he is familiar with the 18-gauge, 55-gallon drum weighing from 48 to 52 pounds, having bought a considerable quantity of them, including 18-gauge, 55-gallon drums, imported from Iceland, as containers of cod-liver oil; that such Iceland drums have a distinct physical characteristic such as the drum marked exhibit A for identification; that drums containing fish oil are easily distinguishable by their odor and general appearance; that he has handled 18-gauge, 55-gallon olive oil drums which are very similar to the fish oil drums; that the fish oil drums are slightly more difficult to clean than the average drum and such drums are given a little extra treatment in order to remove the odor; that all second-hand drums received by his firm are put through the denting process, which sounds like something important but is really a simple operation; that all drums are cleaned on the inside, even if they have contained a chemically pure alcohol, but when containing a fish oil something extra is put into the solution in order to remove the odor; that all drums are examined for rust, although the cod-liver oil drums are not as susceptible to rust as some of the drums containing American oils; that at times cod-liver oil drums are delivered to their customers in the same condition in which they are bought, without repainting and having the skim of cod-liver oil on the inside, but as a rule all drums, American as well as foreign, are reconditioned, and that in the course of a year his firm handles 400,000 drums and reconditions practically all of them.

The witness further testified that the symbols "S. T. C." or "O. T. S." on a drum identifies it as one good for a single trip or a one-time shipper for a hazardous material such as gasoline or acids, the terms applying only to inflammable, explosive, or corrosive materials, and when a drum is so marked it can be used for one trip for such materials, but there is no restriction for the re-use of such drums as containers of materials that are not dangerous; that he has bought second-hand drums, including containers of cod-liver oil of 55-gallon capacity and such drums are brought to his plant by a thousand or more barrel dealers who buy drums for resale, his company doing only about 5 per centum of its own carting; that drums of 55-gallon capacity weighing from 70 to 110 pounds are very often reconditioned by the industries using them, such as cleaning for use over again, but if the commodity is not inflammable, corrosive, or explosive, they use the 18-gauge, 55-gallon drum weighing 48 to 55 pounds, and that drums of such type are repeatedly used.

The controversy concerning the adaptability of cod-liver oil drums arose in this court as early as 1931 and many cases have been heard and decided upon that issue, the principal case being that of *Huisking* v. *United States*, T. D. 45017, here relied upon by the plaintiff. As in that case, invariably the plaintiffs in such cases were able to establish, without contradiction, that cod-liver oil drums were one-time shippers, which, after emptying, were not capable of re-use, primarily because of the impossibility of removing the odor of the cod-liver oil therefrom, and that such drums were necessarily discarded as useless.

The evidence now before us establishes that the so-called one-time shippers, while only designed for one trip as containers of explosives, inflammable materials, and corrosives, are in the same status as any other used drum; that second-hand drum dealers are in business for profit in the buying and reconditioning of such drums for resale and, in reconditioning, drums of American manufacture, as well as foreign drums, receive the same treatment and are sold together and interchangeably in filling the orders of their purchasers. As to cod-liver oil drums, the testimony establishes that such drums are regularly cleaned of the odor and the film of oil remaining therein and in large quantities were reconditioned and resold in the United States for use in transporting all kinds of merchandise except inflammable, and like materials, the same as other reconditioned drums. In fact, the evidence indicates that the second-hand drum business pertains principally to the reconditioning of so-called one-time shippers, drums of 18- or 19-gauge metal. The process of reconditioning, according to the testimony, is not so elaborate as to constitute a remanufacture of drums from mere materials, and, if it were, such processes apply likewise to comparable American drums, and the fact that the drums herein had been deliberately mutilated after removal of the oil for the

purpose of relieving the importers from duty would not alter their dutiable status. Such a situation arose in *Frank Tea & Spice Co.* v. *United States*, Abstract 32378, where the court stated that the desire of an importer to prevent the re-use of imported drums after disposing of their contents by cutting off their heads in emptying the same was insufficient to establish that the importer's mode of emptying such drums was necessary and usual in the ordinary course of business. In *Foster* v. *United States*, T. D. 47922, the court stated in that respect as follows:

* * *. However, we might add that the deliberate destruction of the drums after importation because of the inability of the importer, due to market conditions, to find a purchaser, or in the hope that such action would relieve him from the payment of duty upon the drums, is insufficient evidence upon which to base a finding that such drums were to be regarded as one-time shippers and had exhausted their usefulness after being emptied of their contents. * * *.

A review of the decisions relative to the dutiable status of second-hand drums fails to disclose that the so-called one-time shippers by reason of such status alone are inherently subject to free entry. See *United States* v. *Bene*, 6 Ct. Cust. Appls. 523, T. D. 36145; *Pacific Creosoting Co.* v. *United States*, 1 Ct. Cust. Appls. 312, T. D. 31407; *Martindale* v. *Cadwalader*, 42 Fed. 403. In *A. Gash Refining Corp.* v. *United States*, T. D. 47890, the court pointed out that drums subject to free entry fall under three general classifications, such as the following: When at the time of arrival in the United States, they are in such condition that their commercial value as containers, after the removal of their contents, is precluded and they do not, in fact, enter the commerce of the United States in competition with other containers. See *American Shipping Co.* v. *United States*, T. D. 43316; *Squibb* v. *United States*, Abstract 4409. When the condition of their contents is such that it was either necessary, or the general commercial practice, to destroy the containers as coverings in the removal of their contents. See *Lusskin* v. *United States*, Abstract 597; *Campbell* v. *United States*, Abstract 4888; *Columbia Naval Stores Co.* v. *United States*, Abstract 6925; *Steeb* v. *United States*, Abstract 8449; *Mailliard & Schmiedell* v. *United States*, Abstract 8450; *United States* v. *Braun Chemical Co.*, 2 Ct. Cust. Appls. 57, T. D. 31596; *Harshaw Fuller & Goodwin Co.* v. *United States*, Abstract 16880; *Archer Rubber Co.* v. *United States*, Abstract 38363; *General Aniline Works, Inc.* v. *United States*, T. D. 49291. And finally when the nature of their contents precludes their further use commercially as containers. See *Huisking* v. *United States*, T. D. 45017.

It may not be presumed that, in inserting into the law a duty upon drums, whether the same be full or empty, Congress contemplated the imported drums to be in a condition for re-use immediately after being emptied of their imported contents, but evidently the intention

was to levy a duty upon such drums as may be bought and sold as containers in competition with like drums of American manufacture, after restoration to a usable condition. Inasmuch as 50- or 52-pound, 18-gauge drums of American manufacture are bought and sold in the United States, upon being emptied of their contents and after having been reconditioned by second-hand drum dealers, and 48-pound, 18-gauge foreign drums of like construction, after reconditioning, compete with said American drums in the trade and commerce of the United States, such foreign drums are clearly intended to become dutiable upon the basis of their value at the time of importation in their filled condition. If the collector finds such drums capable of re-use when landed in the United States, they are dutiable unless it is established that they are within the exceptions noted in the foregoing decisions.

In our opinion, the plaintiff has failed to establish that the drums herein, by reason of the nature of their contents, are precluded from re-use after reconditioning, and therefore such drums are not within the same tariff status as the drums the subject of decision in *Huisking* v. *United States, supra,* nor do we find that such drums should be relieved from duty under other claims pressed by the plaintiff. On the other hand, the evidence establishes that said drums are properly dutiable at 25 per centum ad valorem under paragraph 328 of the Tariff Act of 1930, as assessed by the collector.

Judgment will therefore be entered in favor of the defendant.