WHITE LAMB FINLAY, INC. *v.* UNITED STATES (No. 4347)[1]

[1] C. A. D. 192.

United States Court of Customs and Patent Appeals, January 5, 1942

*James W. Bevans* for appellant.
*Charles D. Lawrence*, Acting Assistant Attorney General (*Daniel I. Auster*, special attorney, of counsel), for the United States.

[Oral argument October 9, 1941, by Mr. Bevans and Mr. Auster]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges

LENROOT, Judge, delivered the opinion of the court:

This is an appeal from a judgment of the United States Customs Court (Third Division) in a reappraisement proceeding affirming a judgment of the single judge holding that the proper basis for appraisement of the involved merchandise is its export value, and that such export value is its appraised value. The merchandise consisted of

woven flax paddings exported from Belgium in 1939, and was appraised at its export value at 6 Belgian francs per meter, packed, less 3 per centum. It was entered by appellant at the value of 4.15 Belgian francs per meter, packed, less 3 per centum.

The case was submitted to the trial court upon a written stipulation between the parties, which reads as follows:

It is Stipulated by and between counsel, subject to the approval of the Court, as follows:

1. That the merchandise involved in the above-entitled suit, or merchandise similar thereto, was not freely offered for sale for home consumption to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, at the time of exportation of the instant merchandise or subsequent thereto, but was manufactured solely for exportation to the United States, by the manufacturer herein or by other manufacturers of such or similar merchandise.

2. That the merchandise forming the subject matter of this suit or merchandise similar thereto was freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade for exportation to the United States, at the time of exportation of the instant merchandise and subsequent thereto, for future delivery by the exporter herein and by other manufacturers of such or similar merchandise.

3. That the merchandise involved in this suit was purchased by plaintiff on an order dated June 21, 1939, in accordance with which deliveries were to be made during September, October, and November, 1939, at the price of 4.15 Belgian Francs per meter, packed, less 3%.

4. That the merchandise involved in this suit was exported from Belgium on October 25, 1939.

5. That on or about September 20, 1939, the manufacturer of said merchandise had freely offered for sale to all purchasers for exportation to the United States such or similar merchandise for future delivery at 6 Belgian Francs per meter packed, less 3%.

6. That on September 20, 1939, plaintiff herein placed an order with the said manufacturer for such or similar merchandise at the price of 6 Belgian Francs per meter, packed, less 3%, for delivery during January, February, and March, 1940.

7. That in the ordinary course of trade such or similar merchandise was not carried in stock by the manufacturer in Belgium of the instant merchandise for spot delivery, and no deliveries had been made of such or similar merchandise by the manufacturer of the instant merchandise at the price of 6 Belgian Francs at the time of exportation of the merchandise involved herein from Belgium, namely, October 25, 1939.

8. That in the ordinary course of trade, such or similar merchandise was not carried in stock by other manufacturers in Belgium of merchandise similar to that imported herein for spot delivery, and no deliveries had been made by other manufacturers of such or similar merchandise at the price of 6 Belgian Francs at the time of exportation of the merchandise involved herein from Belgium, namely, October 25, 1939.

9. That if the invoice price under the order of June 21, 1939, is held to be the export value, for duty purposes, under section 402 (d) of the Tariff Act of 1930, of the merchandise involved herein, the entered value correctly represents such export value.

10. That if the appraised value, equivalent to the price of the order placed September 20, 1939, is held to be the export value for duty purposes under section 402 (d) of the Tariff Act of 1930 of merchandise involved herein, then the appraised value correctly represents such export value.

Plaintiff waives the right to first docket call and the case is hereby submitted on this stipulation; plaintiff having 30 days from date of filing hereof for brief, and defendant 30 days after service of plaintiff's brief for filing its brief.

No other evidence was introduced upon the trial of the case.

As will be observed, the stipulation recites in substance that the merchandise under consideration, and merchandise similar thereto, was manufactured solely for exportation to the United States; that in the ordinary course of trade such or similar merchandise was not carried in stock by the manufacturers in Belgium for spot delivery, but was freely offered for sale to all purchasers for exportation to the United States for future delivery; that the merchandise here involved was purchased by appellant on an order dated June 21, 1939, at 4.15 Belgian francs per meter, packed, less 3 per centum, and deliveries of the merchandise were. to be made during September, October, and November, 1939; that the merchandise was exported from Belgium on October 25, 1939; that on or about September 20, 1939, the manufacturer of the involved merchandise freely offered for sale to all purchasers, for exportation to the United States, such or similar merchandise for future delivery at the price of 6 Belgian francs per meter, packed, less 3 per centum, and that on September 20, 1939, appellant placed an order with the manufacturer for such or similar merchandise at the price of 6 Belgian francs per meter, packed, less 3 per centum, for delivery during January, February, and March, 1940.

The pertinent provisions of section 402 of the Tariff Act of 1930, under which the merchandise was appraised, and under which both parties agree that it should be appraised, read as follows:

SEC. 402. VALUE

\*       \*       \*       \*       \*       \*       \*

(d) EXPORT VALUE.—The export value of imported merchandise shall be the market value or the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

The two tribunals below, in approving the appraised value, held that the price of 4.15 Belgian francs per meter, packed, less 3 per centum, which was the price at which the merchandise was contracted to be sold in June, 1939, the goods being exported on October 25 of the same year, did not constitute export value for them, but that the price

of 6 Belgian francs per meter, packed, less 3 per centum, at which similar goods were being freely offered for sale, and which appellant agreed to buy on its second order, but which goods were for future delivery in 1940, was the proper export and dutiable value.

Appellant makes two main contentions:

First. That the value found by the tribunals below, to wit, 6 Belgian francs per meter, packed, less 3 per centum, based on the market price at which the goods were being freely offered for future delivery at the time of the exportation of appellant's first order, was not the proper export value for the reason that at the time said offers were being made there were no goods on hand or which could be produced for reasonably prompt delivery, relying largely on the decision of this court in *Kuttroff, Pickhardt & Co. (Inc.)* v. *United States*, 14 Ct. Cust. Appls. 176, T. D. 41698.

Second. That the entered value must be sustained by virtue of the applicability of the doctrine of legislative ratification of long-continued administrative practice.

We will first consider appellant's second contention.

The tariff act of 1913 provided in paragraph R for the assessment of duty on imported dutiable merchandise at its actual market value or wholesale price, but defined such value as:

\* \* \* the price at which such merchandise is freely offered for sale to all purchasers in said markets, in the usual wholesale quantities, and the price which the seller, shipper, or owner would have received, and was willing to receive, for such merchandise when sold in the ordinary course of trade in the usual wholesale quantities \* \* \*.

On June 3, 1916, the Treasury Department, charged with the administration of the customs laws, issued T. D. 36448, which purported to interpret the above-quoted valuation provision of the tariff act of 1913. Said T. D. 36448 read as follows:

TREASURY DEPARTMENT, *June 3, 1916.*
*To appraisers of merchandise and others concerned:*

It appears from a discussion at the appraisers' conference that there is a lack of uniformity in appraising merchandise of which notice of a change in value has been received. Some appraising officers apply the new price on all shipments made after the change of price, and others wait until they have evidence of deliveries at the new price either in the country of exportation or the United States.

It further appears that there are two classes of merchandise, viz., one which may be termed stock goods which are ready for delivery at all times, and the other goods which are manufactured on orders for future delivery.

As to the first class, the department is of the opinion that the new price should be put into effect on all purchases made after the date on which the new price is to take effect, but that as to purchases made before that date and not shipped until after the new price becomes effective the new price should not be applied unless there is evidence that sales have been made at the new price.

With respect to the second class, the new price should be applied to old contracts only when there is evidence that deliveries have begun at the new price.

When the appraising officer has no information as to whether sales have been made or delivery begun at a changed price, he should withhold appraisement until he can secure information on the subject.

ANDREW J. PETERS, *Assistant Secretary.*

It is with the second class of goods referred to in said Treasury decision, that is, goods manufactured on orders for future delivery, that we are here particularly concerned.

The practice purporting to be authorized in said Treasury decision apparently continued in effect until February 2, 1938, when the Commissioner of Customs in T. D. 49381, 73 Treas. Dec. 165, directed a change in said practice, which change authorized appraisement under said section 402 of the Tariff Act of 1930 at the price at which such or similar merchandise was freely offered for sale to all purchasers at the time of exportation, regardless of whether or not there had been any sales or deliveries at the new price.

Appellant argues that the interpretation made by the Treasury Department in 1916 continued in effect for more than 20 years, during which time Congress enacted the Emergency Tariff Act, 1921, and the Tariff Acts of 1922 and 1930, with no change in the language "freely offered for sale to all purchasers" as interpreted in said T. D. 36448; that by the enactment of said tariff acts subsequent to the tariff act of 1913, Congress adopted the interpretation set forth in said Treasury decision, and that therefore the words "freely offered for sale to all purchasers," as found in section 402 (d) of the Tariff Act of 1930, should be interpreted in accordance with said Treasury decision.

Appellant further contends, in effect, that the appellate division erred in holding that said T. D. 49381, issued in 1938, revoked the interpretation given in said T. D. 36448 to the words "freely offered for sale to all purchasers," for the reason that such interpretation had, by implication, been adopted by Congress in the Tariff Act of 1930, and that such interpretation was not subject to revocation by the Treasury Department.

For the purposes of this case we may assume that if said T. D. 36448 was a valid regulation in effect at the time of the importation of the involved merchandise, and assuming that the price of 4.15 Belgian francs per meter, less 3 per centum, was the freely offered price for such or similar merchandise on June 21, 1939, for future delivery, the contention of appellant should have been sustained by the Customs Court.

However, we are of the opinion that said T. D. 36448 never had any validity and was a nullity from the date of its promulgation. Our reasons for so holding are hereinafter stated.

If T. D. 36448 was a nullity there could have been no proper administrative practice under it, and Congress could not, by use of the same

language—"freely offered for sale," etc.—in subsequent tariff enactments, be presumed to ratify the interpretation given by said T. D. 36448 to the phrase "freely offered for sale to all purchasers."

In the case of *United States* v. *Gruen Watch Co.*, 21 C. C. P. A. (Customs) 225, T. D. 46761, involving the question of the validity of a customs regulation, the court said:

We are not impressed with the argument of the Government that the issue in this case is controlled by legislative practice. No authority has been cited, and we have found none, to the effect that legislative silence may validate an invalid regulation. If the regulation is invalid, the silence or absence of affirmative action on the part of Congress, in our judgment, cannot be regarded as a sufficient circumstance to warrant a holding that it is in fact valid. * * *

That long-continued administrative practice by the customs officials may not be properly invoked by a party if such practice is clearly contrary to law, is well established. *Pacific Creosoting Co.* v. *United States*, 1 Ct. Cust. Appls. 312, T. D. 31407; *Lloyd Co.* v. *United States*, 9 Ct. Cust. Appls. 280, T. D. 38217; *United States* v. *Field & Co.*, 14 Ct. Cust. Appls. 376, T. D. 42031; *United States* v. *Jules Raunheim (Inc.) et al.*, 17 C. C. P. A. (Customs) 425, T. D. 43867.

In harmony with the foregoing is the rule that in the construction of a statute administrative practice may be resorted to only where the meaning of the statute is doubtful. *United States* v. *Jules Raunheim (Inc.) et al., supra; Pittsburgh Plate Glass Co.* v. *United States*, 2 Ct. Cust. Appls. 389, T. D. 32162; *James F. White & Co.* v. *United States*, 23 C. C. P. A. (Customs) 224, T. D. 48061.

In our opinion the expression in section 402 (d)—"freely offered for sale to all purchasers * * * for exportation to the United States" —is not ambiguous, and we have in effect so held.

In the case of *Sandoz Chemical Works* v. *United States*, 13 Ct. Cust. Appls. 466, T. D. 41365, this court, speaking of identical language— "freely offered for sale to all purchasers"—contained in section 402 (f) of the Tariff Act of 1922, stated:

* * * It will be noted that the statute (sec. 402 [f]), does not require a sale of the product; it is sufficient if it be freely offered for sale.

In section 302 of the Emergency Tariff Act, 1921, it was provided that "the export value of imported merchandise shall be the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is sold or *freely offered for sale to all purchasers* * * * for exportation to the United States." [Italics ours.]

In the case of *Robinson & Co. et al.* v. *United States*, 13 Ct. Cust. Appls. 644, T. D. 41486, there was involved the appraisement of certain merchandise under said section 302. In its opinion the court stated:

If that section had provided that export value was the price at which merchandise was *sold* to all purchasers in the principal markets of the country from which

exported, there might be some ground for saying that the appraisement was not made in accordance with law. Section 302 does not so provide, however, and *clearly contemplates* not only actual sales, but offers for sale freely made to all purchasers for export to the United States. Under the emergency tariff act mere offers for sale if made to all persons desiring to purchase goods for export to the United States were just as effective in making export value as sales actually made and concluded. * * * [Last italics supplied.]

If Congress intended that only sales passing title should be determinative of export value, it would have defined export value as the price at which merchandise was *sold* for export to the United States and left out of the "equation" the price at which such merchandise was freely offered for sale to all purchasers. * * *

To the like effect are the cases of *Oceanic Trading Co.* v. *United States*, 21 C. C. P. A. (Customs) 146, T. D. 46478, and *United States* v. *T. E. Ash, etc.*, 22 C. C. P. A. (Customs) 395, T. D. 47401, respecting similar language in section 402 of the Tariff Act of 1930.

In the case of *United States* v. *Baldwin Universal Co.*, 18 C. C. P. A. (Customs) 395, T. D. 44641, there was involved paragraph (b) of section 402 of the Tariff Act of 1922, which defined the foreign value of merchandise. The trial court had held that a certain price list could not be considered as evidence of foreign value for the reason that there was no proof of deliveries made at the prices shown thereon.

We stated in our opinion in said case that we saw no reason why the same construction should not be given to the words "freely offered for sale" under paragraph (b) of section 402 of the Tariff Act of 1922 as we had given the same words in section 402 (f) in the case of *Sandoz Chemical Works* v. *United States, supra*, and to the same words in section 302 of the Emergency Tariff Act, 1921, in the case of *Robinson & Co. et al.* v. *United States, supra*. A like observation is here applicable as to paragraph (d) of section 402 of the Tariff Act of 1930 here involved. In the case of *United States* v. *Baldwin Universal Co., supra*, we said:

* * * It is perfectly true that in any given case the facts may be such as to require evidence of sales under a price list, in order to establish such price list as effective, but we cannot hold, as a matter of law, that in all cases there must be sales at the prices named in a price list, and that it is not effective prior to the date of such sales. This the lower court did, as we construe its decision, and we think this constitutes reversible error. * * *

We now proceed to apply the foregoing principles to the case at bar.

It will be observed from said T. D. 36448 that, as to stock goods, or goods on hand, purchased before the date on which the new price is to take effect, and not shipped until after the new price becomes effective, the new price should not be applied unless there is evidence that sales have been made at the new price; and that, as to goods manufactured for future delivery, the new price should be applied to old contracts only when there is evidence that deliveries have begun at the new price.

It is true that in the case of *United States* v. *Baldwin Universal Co.,* *supra,* we stated, as hereinbefore quoted, that in any given case the facts might be such as to require evidence of sales under a price list in order to establish such price list as effective; but it is plain that in such cases evidence of sales would be considered only for the purpose of establishing the *bona fides* of the offer. In that case the lower court had held that in *all* cases there must be evidence of sales at prices named in a price list in order to make such price list effective. This we held to be reversible error. Under T. D. 36448, a new price could not in any case be applied to old contracts unless there had been deliveries under the new price; this is exactly what we held in the case last above cited was contrary to law.

Furthermore this court, prior to the enactment of the Tariff Act of 1930, had held, in effect, that the language "freely offered for sale to all purchasers" in paragraph (f) of section 402 of the Tariff Act of 1922 was not ambiguous, and that it did not require a sale of the product offered, but that "it is sufficient if it be freely offered for sale." *Sandoz Chemical Works* v. *United States, supra.*

This holding in the case last cited was clearly contrary to the interpretation given to the words "freely offered for sale to all purchasers" in said T. D. 36448, and if there be any legislative ratification of the interpretation of said words, it must be presumed that Congress adopted the judicial interpretation thereof.

The rule as laid down in said Treasury decision is so clearly contrary to the provisions of section 402 of the Tariff Act of 1930 and so clearly contrary to our decisions hereinbefore cited, and many others which might be cited, that further comment thereon is unnecessary.

Convinced as we are that said T. D. 36448 was invalid *ab initio* the question to be decided is whether the free offer for future delivery of such or similar merchandise on September 20, 1939, for export to the United States, at the price of 6 Belgian francs per meter, packed, less 3 per centum, constituted any substantial evidence of the export value of the involved merchandise. This is the question embraced in appellant's first contention as hereinbefore set forth.

In our opinion such offer of September 20, 1939, does constitute very substantial evidence warranting the trial judge and appellate division in finding the export value of the merchandise at the time of its exportation to the United States to be 6 Belgian francs per meter, packed, less 3 per centum.

There is here no question as to the *bona fides* of the offer of September 20, 1939, for appellant availed itself of it and made a purchase on said date at the offered price for future delivery in January, February, and March, 1940.

In the case of *Kuttroff, Pickhardt & Co. (Inc.)* v. *United States, supra,* this court, in considering paragraph (f) of section 402 of the Tariff Act of 1922, said:

To freely offer an article for sale within the contemplation of subdivision (f) it should, at least, appear that some reasonable quantity of the offered article was ready or *could be produced for reasonably prompt delivery.* * * * [Italics ours.]

Section 501 of the Tariff Act of 1930 provides:

* * * The value found by the appraiser shall be presumed to be the value of the merchandise and the burden shall rest upon the party who challenges its correctness to prove otherwise.

It is presumed that the appraiser found every fact to exist that was necessary to sustain his appraisement. See *E. I. du Pont de Nemours & Co.* v. *United States,* 27 C. C. P. A. (Customs) 146, C. A. D. 75.

Therefore it must be presumed that the appraiser found that there could be prompt delivery of the merchandise embraced in the September 20, 1939, offer, and the burden was upon appellant to prove the contrary.

We find nothing in the stipulation herein to the effect that such or similar merchandise could not have been manufactured and promptly delivered at the September 20, 1939, price.

It does not appear that offers for future delivery were not accepted prior to October 25, 1939, at the September 20 price of 6 Belgian francs per meter, packed, less 3 per centum, the merchandise to be delivered at a time which would constitute prompt delivery after the offer was accepted. If there were such, under the principle of our decision in the case of *Kuttroff, Pickhardt & Co. (Inc.)* v. *United States, supra,* the offer of September 20, 1939, was substantial evidence of the export value of the involved merchandise at the date of exportation thereof.

The stipulation before us merely states that no deliveries had been made at the September 20 price at the time of the exportation of the involved merchandise, viz, October 25, 1939. Deliveries, however, might have been normally possible on or before October 25, or within such time thereafter as to constitute a prompt delivery.

The stipulation was evidently drawn with the intent to make applicable the provisions of said T. D. 36448 if said Treasury decision was effective at the date of exportation of the involved merchandise.

Inasmuch as we hold that said T. D. 36448 was never effective, the rule obtains that free *offers* of merchandise for future delivery establish a market price if the delivery can be prompt, and the ability of sellers to make prompt delivery of such merchandise under the September 20 offer is not negatived by the stipulated fact that there had been no deliveries of merchandise so offered on or prior to October 25, 1939; for, as hereinbefore stated, there might have been deliveries

after October 25, or ability to make deliveries on or before or after October 25, in fulfillment of orders placed prior thereto, which would have been prompt deliveries under the September 20, 1939, offer.

Therefore, we are of the opinion that upon the stipulation before us the September 20, 1939, offer of 6 Belgian francs per meter, packed, less 3 per centum, for merchandise such as is here involved, is substantial evidence of the export value of the involved merchandise. Furthermore, there is nothing in said stipulation overcoming the presumption of the correctness of the appraisement by the local appraiser.

We have not discussed the holding of the lower court that T. D. 49381 revoked T. D. 36448, which holding is challenged by appellant, for the reason that, since we hold that T. D. 36448 was invalid from the beginning, a discussion of this question is unnecessary.

For the reasons stated herein, the judgment appealed from is *affirmed*.

GARRETT, P. J., concurring in the result:

The validity of T. D. 36448 was not challenged by the Government in the instant case and, in view of the facts presented, I can see no occasion for passing upon it or upon the question of its having been ratified by long-continued legislative practice.

A careful reading of the stipulation leads me to the conclusion that appellant has failed to present any substantial evidence which overcomes the presumption of correctness attaching to the collector's appraisement. I, therefore, concur in the result.

BLAND, Judge, concurring in the conclusion:

Under the stipulation the majority passes upon questions not properly before the court. The stipulation is fatally defective in material facts and does not raise the question of the validity of the regulation of 1916. First—it is not stipulated that the price of 4.15 Belgian francs was the freely offered price for such or similar goods on June 21, 1939. Free offers might have been made at a price other than that which appellant paid on delivery of the goods offered on that date; second—it is not shown that there were not free offers, sales, and deliveries made of such or similar merchandise at a price greater than 6 Belgian francs per meter, packed, less 3 per centum, prior to the time the appraiser applied the new price to the old contract and on such a date as to show the value of the instant goods.

Therefore, it is apparent that even if the importer has proved the value established by the appraiser to be erroneous, it has not carried the burden which the law requires of proving that its claimed value is the proper one. Such a holding might well end the case.

The appraised value, though stated to be export value by the appraiser, might be the proper value under cost of production or Amer-

ican selling price. If there were other offers, sales and deliveries (not negatived by the stipulation) at a price greater than 6 Belgian francs per meter, packed, less 3 per centum, prior to the time the appraiser applied the new price to the old contract and on such a date as to show the value of the instant goods, the regulation would not be violated and could not be questioned in this proceeding.

Aside from any effect of legislative ratification of long-continued administrative practice, I am not convinced that the regulation on its face is invalid or contains any provision not sanctioned by the statutory definition of "export value." The gist of the decision of the majority is to the effect that the term "freely offered for sale to all purchasers for exportation to the United States" was erroneously interpreted by the Secretary of the Treasury, and that, therefore, it was a "nullity" and "invalid" from the start. The majority holds that the term is not "ambiguous" and that there can be no legislative ratification of what the majority regards as an invalid regulation.

As I see it, there is more language in the statutory definition of "export value" than the term "freely offered for sale to all purchasers for export to the United States" to be construed, and to be given application. The mandate of the provision is that the export value shall be "the market value or the price, *at the time of exportation* of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers." The regulation in controversy attempted to construe the statutory definition so as to afford some standard as to what offers or sales should be accepted as reflecting the *price on the date of exportation* of the exported merchandise. The regulation merely said: "We will let the old price continue until it is shown to have been changed by deliveries having begun at a new price." None might ever be shipped at the new price and the old price might continue to control. This was a reasonable provision; one that was fair to all and was never, as far as I know, questioned or disturbed until the Treasury Department, more than a year before the goods involved were ordered, decided to change it. Congress, I think, was satisfied with the regulation which is reasonably within the power granted to the Secretary of the Treasury.

If the controverted regulation had been in effect when appellant's importation was made, no one, I think, could logically contend, under the facts at bar, that a clear case of legislative ratification of long-continued administrative practice was not shown. Three tariff acts had passed, all using substantially the same language, but the difficulty with appellant's position is that long before it made its order the regulation had been changed by the same authority that made it. Appellant argues that if Congress had ratified it, the Treasury Department had no right to change it and could not do so. I had thought this was the law, but the Supreme Court has held otherwise in a very

recent decision. In *Helvering* v. *Wilshire Oil Co.*, 308 U. S. 90, regulations involving the meaning of such terms as "net income," "gross income," "reasonable allowance for depletion," and "development expenses" were involved. The words, in themselves, were not ambiguous, but, broadly speaking, the statute was *indefinite* in its terms so as to make their application difficult. The Supreme Court in an opinion by Mr. Justice Douglas, in that case held a regulation valid which changed one claimed to have received legislative sanction and held that the same rule-making power has the right to change it and the first one does not become "frozen into another act merely by reenactment of that provision, so that that administrative interpretation cannot be changed prospectively through exercise of appropriate rule-making powers."

So, in the instant case, I do not think legislative sanction of long-continued administrative practice applies, not because the language is clear, not because the regulation was "invalid" but because, regardless of its validity or invalidity, it had been changed by what the Supreme Court characterizes as the Treasury Department's exercise of its "continuing rule-making power."

So, in view of the *Wilshire Oil Co.* case, *supra*, I agree with the trial court in its holding that there was no long-continued administrative practice in existence at the time importer made its order or its importation and therefore it could not claim a recovery under that theory of law.

As I understand the view of the majority on the subject of legislative ratification of long-continued administrative practice, it would almost completely wipe out the effectiveness of such a doctrine, although our Supreme Court in many leading decisions, old and new, has given it controlling influence in the decision of cases. A regulation is not invalid even though it *erroneously* interprets a statute, as long as it is a reasonable one and is not a direct violation of the law. Obviously, the Secretary of the Treasury has no power to legislate, and it is only where there is doubt as to the correctness of the Secretary's interpretation of the statute that the doctrine of legislative ratification could ever be raised. The doctrine is based upon the theory that Congress is satisfied with the manner in which the rule-making power performs, and has adopted its interpretation as if it were its own and expressed in the statute itself.

I regard it as most unfortunate for any court to make the mistake of making hair-splitting distinctions between that which is "ambiguous" and that which is not in determining a question of the character at bar. Likewise is it unfortunate to fail to apply the doctrine of legislative ratification of long-continued administrative practice under the well-settled rule upon the ground that the regulation is "invalid"

or a "violation of the law" where it appears that the regulation is merely one reasonable interpretation of a statute. This phase of the rule is stated in a number of interesting Supreme Court cases. In *National Lead Co.* v. *United States*, 252 U. S. 140, 145, the Supreme Court, in referring to a departmental regulation relating to the statute authorizing the recovery of drawback "equal in amount to the duties paid on the materials used [etc.]" said:

> The statute, thus *indefinite if not ambiguous,* called for construction by the Department and the regulation adapted to cases such as we have here, commends itself strongly to our judgment. [Italics mine.]

> \* \* \* \* \* \* \*

> From *Edwards* v. *Darby,* 12 Wheat. 206, to *Jacobs* v. *Prichard,* 223 U. S. 200, it has been the settled law that when *uncertainty* or ambiguity, such as we have here, is found in a statute great weight will be given to the contemporaneous construction by department officials, who were called upon to act under the law and to carry its provisions into effect,—especially where such construction has been long continued, as it was in this case for almost forty years before the petition was filed. *United States* v. *Hill,* 120 U. S. 169. [Italics except case names mine.]

> \* \* \* \* \* \* \*

> \* \* \* The reenacting of the drawback provision four times, without substantial change, while this method of determining what should be paid under it was being constantly employed, amounts to an implied legislative recognition and approval of the executive construction of the statute \* \* \*.

The drawback claimant had made, from each bushel of imported linseed, 20 pounds of linseed oil and about 36 pounds of oil cake. He exported the cake and claimed drawback based upon its *weight.* In that case the department had ruled, in said regulation, that the statute did not authorize the exporter to obtain drawback based upon *weight* but upon the relative *values* of the oil and the oil cake. The oil was much more valuable than the cake. The statute (like the instant one) gave no guide for its application. It was indefinite. The Supreme Court not only stated its approval of the regulation but held that the department's interpretation had received implied approval by Congress and that it should not be disturbed.

If the rule-making power in the instant case had not changed the regulation, I would hold the same here. The regulation was a reasonable means of determining what Congress meant with reference to the export value of merchandise bought subject to order which could not be delivered for a long while. It was obvious to the rule-making power that goods bought at a certain price in June and delivered in October might be worth more or less on the date of exportation than they were in June. In construing the statutory definition it did what the courts have done and what the majority opinion attempts to do in this case—give probative value to sales and offers, made *not on the date of exportation,* but near enough such date as to reflect the value on that date. Courts have held, so frequently as to require

no citation, that a sale made at some date reasonably near the date of exportation of merchandise, the value of which is in controversy, may reflect the true value on the date of exportation, and this is true ordinarily when no change in value is shown. The controverted regulation which the majority holds to be invalid rejected new offers as lacking *bona fides* unless deliveries had begun. This was upon the simple process of reasoning that a mere offer, made possibly to establish a market value, without the possibility of delivery and without any delivery ever being made could not change the effect of the old offer at a certain price.

Many different decisions by the Supreme Court could be referred to where legislative adoption of long-continued administrative practice was discussed and where the language was far less indefinite as applied to the question then at bar than the statutory definition in controversy here.

It seems to me that the danger in the opinion of the majority lies in holding that by reason of lack of *ambiguity* legislative adoption of long-continued administrative practice does not apply. The language may be plain in a statute and it may be given application by administrative officers in more than one reasonable way. The definition of "export value" was given application in this instance, I think, in the regulation in controversy in a reasonable way, although other interpretations could reasonably be indulged. It is this kind of situation which has always brought forward the statement by the courts that where substantially the same language has been used in reenactments, administrative interpretation long continued will not be disturbed.

The rule is laid down in *New York, New Haven and Hartford Railroad Co.* v. *Interstate Commerce Commission*, 200 U. S. 361, 401, as follows:

* * * the familiar rule that a construction made by the body charged with the enforcement of a statute, which construction has long obtained in practical execution, and has been impliedly sanctioned by the reenactment of the statute without alteration in the particulars construed, *when not plainly erroneous*, must be treated as read into the statute. * * * [Italics ours.]

See also *Brewster* v. *Gage*, 280 U. S. 337.

To decide the issue before us it is wholly unnecessary to rule upon the validity of a regulation which was no longer in existence, but it could have been and should have been held, as the trial court held, that there was no long-continued administrative practice in existence which affected appellant's rights. *Helvering* v. *Wilshire Oil Co., supra.*

It seems to me that the greatest violence to the law is done in the decision of the majority by holding that the statutory provision is

not ambiguous, and that, therefore, resort to the doctrine of legislative ratification is barred. The mere fact that we might feel (which I do not) that a better interpretation of the perplexing situation confronting the Secretary of the Treasury in interpreting the indefinite language used by Congress might have been suggested is no warrant for holding that the regulation was a "nullity" and invalid.

A situation similar to the one which I am now discussing arises in the decision of customs cases where the question of seeking the aid of legislative history for the purpose of arriving at congressional intent of language used in tariff acts is being considered. If the language is plain and has but one meaning, the rule is well settled that legislative history of the provision cannot change it. This is on the theory that no construction is necessary. But it has been frequently held that although the language is plain, the congressional intent is thrown in doubt when more than one tariff provision covers the same imported material. See *American Net & Twine Co.* v. *Worthington*, 141 U. S. 468, and *United States* v. *E. De Grandmont, Inc.*, 21 C. C. P. A. (Customs) 17, T. D. 46345. In such cases it would be erroneous to hold that the language is plain and unambiguous and therefore that we cannot seek the aid of legislative history. And so it is here. The words "on the date of exportation" in their ordinary acceptance are quite plain and simple of meaning, but when practical application is being made of the words great difficulty has been encountered in determining just what Congress meant, and the courts, including the majority in this case, have concluded that the value on the date of exportation does not necessarily mean some offer or sale made on that particular date, but on some date near enough, no change being shown, to reflect the value on that date.

In concluding this phase of the case, I would like to add that I do not think that the case of *United States* v. *Baldwin Universal Co.*, 18 C. C. P. A. (Customs) 395, T. D. 44641, has any material bearing on the issue at bar. We never held that an offer must be accepted as proving a proper dutiable value when no sales or deliveries had been made. We did hold that a price list might be some evidence which the trial court should weigh in arriving at the question as to whether or not the price list reflected the value on the date of exportation.

I am in disagreement with the majority opinion in holding that the free offer, on September 20, 1939, for future delivery of similar merchandise for exportation to the United States, at the price of 6 Belgian francs per meter, packed, less 3 per centum, constituted "very substantial evidence" warranting the holding that this established export value on the date of exportation of the instant merchandise. The instant merchandise was exported on October 25, 1939. The goods offered and purchased on September 20, 1939, were not to be

delivered until January, February, or March of the next year. The record in this instance shows that the market value was going up. When the goods ordered September 21 were exported, orders for future delivery might have been much higher or much lower than 6 Belgian francs per meter.

It may be said here that this line of reasoning may lead to the conclusion that there is no export value as defined by the statute for goods not subject to reasonably prompt delivery unless similar goods which could reflect that value had been sold in due course of trade for prompt delivery and which were on hand at the time the order was made. It may be that the statutory definition of "export value" does not fit this kind of case. If so, there are other ways of determining this value which can readily be resorted to. But a statement of facts proved by an importer which does not show the correct export value, does not warrant an invalidation of the appraisement which may be the correct value under a proper statutory definition. The offer made on September 20 did not say: "These goods are worth 6 Belgian francs today." It said they were worth 6 Belgian francs the next January. There is no showing in the instant record that the order of September 20 was ever delivered. The price might have changed and the foreign manufacturer might have sold elsewhere at a different price.

I quote the following from the majority opinion:

We find nothing in the stipulation herein to the effect that such or similar merchandise could not have been manufactured and promptly delivered at the September 20, 1939 price.

Paragraphs 7 and 8 of the stipulation read:

7. That in the ordinary course of trade such or similar merchandise was not carried in stock by the manufacturer in Belgium of the instant merchandise for spot delivery, and no deliveries had been made of such or similar merchandise by the manufacturer of the instant merchandise at the price of 6 Belgian Francs at the time of exportation of the merchandise involved herein from Belgium, namely, October 25, 1939.

8. That in the ordinary course of trade, such or similar merchandise was not carried in stock by other manufacturers in Belgium of merchandise similar to that imported herein for spot delivery, and no deliveries had been made by other manufacturers of such or similar merchandise at the price of 6 Belgian Francs at the time of exportation of the merchandise involved herein from Belgium, namely, October 25, 1939.

I find no warrant in the record for the above-quoted statement of the majority. Surely the stipulation should be interpreted to say and mean that there were no spot delivery goods of the character manufactured and sold for exportation and the only showing in the stipulation as to when deliveries could be made was long after the date of the order. Surely it was the intent of the parties in the stipulation, which in some respects the majority has most generously inter-

preted, to not suggest even the possibility of the quick delivery of similar goods near the date of the exportation of the instant merchandise. It is definitely stipulated that the manufacturer of the instant merchandise and other manufacturers in Belgium did not carry such or similar merchandise in stock which could be sold for quick delivery.

I am in hearty accord with the following sentence:

\* \* \* Furthermore, there is nothing in said stipulation overcoming the presumption of the correctness of the appraisement by the local appraiser.

The last sentence is about all that is necessary for the decision of the instant issue.